Docket No. 106566.

IN THE
SUPREME COURT
OF
THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ERIC
HANSON, Appellant.

*Opinion filed June 24, 2010.*

JUSTICE GARMAN delivered the judgment of the court, with
opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Kilbride,
Karmeier, and Burke concurred in the judgment and opinion.

**OPINION**

Following a jury trial in February 2008, in the circuit court of
Du Page County, defendant, Eric Hanson, was convicted of four
counts of first degree murder (720 ILCS 5/9–1(a)(1) (West 2006)),
two counts of armed robbery (720 ILCS 5/18–2(a)(1) (West 2006)),
two counts of aggravated kidnapping (720 ILCS 5/10–2(a)(8) (West
2006)) and two counts of identity theft (720 ILCS 5/16G–15(a)(1),
(d)(1)(D) (West 2006)). The jury found death to be the appropriate
sentence on the murder convictions and the circuit court of Du Page
County imposed a sentence of death. The circuit court also found that
the armed robbery and aggravated kidnapping convictions merged into
the murder convictions and, therefore, did not enter sentences on
those counts. However, the circuit court did sentence defendant to

concurrent terms of 15 years for the identity theft convictions. Defendant now appeals both his conviction and sentence.

## BACKGROUND

Defendant was convicted of killing his sister, Katherine Tsao, and Katherine's husband, James. He was also convicted of killing his parents, Terrence and Mary Hanson. The bodies of the four victims were found in James and Katherine's home (the Tsao home) on September 29, 2005. Katherine and James had been bludgeoned. Terrence and Mary had been shot in the head. Police later determined that Terrence and Mary had been shot in their own home (the Hanson home) and then had been wrapped in tarps and transported to the Tsao home.

An investigation into the murders led police to the defendant after police spoke with defendant's other sister, Jennifer Williams. Jennifer told police that Katherine telephoned her six weeks prior to the murders, to tell Jennifer that defendant had been engaged in a scheme to obtain credit in their parents' names. Katherine also told Jennifer that defendant had threatened Katherine by saying that if she told their father what defendant had been doing, he would kill her. The investigation quickly centered on defendant, leading to his arrest.

Prior to trial defendant filed several motions *in limine*, mostly attempting to prevent admission of opinion and hearsay testimony stemming from the investigation. One of these motions sought to prevent reference to Jennifer's belief that defendant was responsible for the crime. This motion was denied. The State also filed a motion *in limine* seeking to admit testimony from Jennifer regarding her phone conversation with Katherine six weeks before the murders. The circuit court granted this motion over defendant's objection. As discussed below, defendant has challenged both of these rulings.

The case proceeded to trial. At the guilt phase of the trial, the following evidence was heard.

Chiuchih Tsao, James's brother, testified that he and James worked together at a trading company. The last time he saw James and Katherine alive was around 5 p.m. on the day of the murders, when the two left work for the day. He then testified that James did not show up for work the next day. He thought it very strange that

James did not arrive for work, so he went to the Tsao home. When he arrived, he first rang the bell. Then, when no one answered, he peered in a window. From the window, Tsao saw a woman on the floor with blood around her. He called his daughter, who, when she arrived at the house, called the police. The fire department arrived first and broke down the front door. Tsao testified that he saw a person sitting on the couch when he went into the house. He went upstairs but did not see anyone there. At that time police asked him to leave the house. During his testimony, Tsao also identified a watch that he had bought for James.

John Eul, an Aurora firefighter, then testified to the events following the emergency call to the Tsao home. Eul testified that when he and his partner arrived, they forced down the front door and entered the house. Inside they saw the bodies of Katherine, James, and Mary. Eul testified that they then determined the scene was not safe and exited the house.

Katherine Von Holten, Mary's coworker and friend, testified that she became worried when Mary did not show up for work on September 29. She testified that Mary had not called in to say she would be late. After noon, Von Holten called Mary at her house phone and cell phone but received no answer. At that point she and another coworker drove to the Hanson home. They entered the Hanson home with the help of a keypad code provided by Jennifer Williams. Inside the home, they noticed nothing out of the ordinary, other than a strong fire burning in the fireplace. Mary's coworkers then left a note for Mary. The note was left next to a note, written by defendant, which read: "Mom, dad, see you Sunday. Have fun in Galena." Next to this note was some cash. The note included a postscript that indicated this money was for "payment this month." While Von Holten was at the Hanson home, Mary's nephew, Bob Stutelberg, arrived. Von Holten testified that Stutelberg also looked through the house. Stutelberg then drove the three of them to the Tsao home. By the time they arrived, emergency personnel had already arrived.

Stutelberg testified that defendant called him the morning of September 29. He testified defendant told him he was on his way to Midway Airport to catch a flight. Defendant asked if he would make it in time. Stutelberg testified defendant was going to be flying to

California. He also testified that defendant mentioned he did not get much sleep the previous night, as his mattress was "rotten." In a second telephone call from defendant, defendant informed Stutelberg that he was at the airport and was going to make his flight.

Stutelberg also testified that on September 29 he received a call from one of Terrence's coworkers. The coworker told Stutelberg that Terrence had missed a meeting that morning. Stutelberg testified that it was unusual for Terrence to miss meetings. Stutelberg tried contacting Terrence and Mary by phone, but was unable to reach them. At this time, Stutelberg drove to the Hanson house, where he encountered Mary's coworkers. Stutelberg, too, mentioned that other than the fire in the fireplace, nothing appeared out of the ordinary in the house. Stutelberg then accompanied Mary's coworkers to the Tsao home.

Stutelberg further testified that between 5:30 and 6 p.m. he called defendant on his cell phone to tell him that the police were saying they found four bodies in the Tsao home. Stutelberg turned the phone over to Detective Nilles of the Aurora police department, who had a conversation with the defendant.

Christine Undesser testified that she and the defendant had gone out together on September 28, the night of the murders. She testified that she and defendant were out from 7 p.m. until around 9:30 p.m. During the evening defendant mentioned that he was flying to California to meet with Allison Beck, his ex-fiancée. Defendant drove Undesser to her home, arriving around 10 p.m. She and defendant talked for 15 minutes and then defendant left.

Allison Beck testified that she and defendant had known each other for six years. They began dating in 2002 and eventually decided to get married. When they were engaged, she and defendant moved to Illinois from Phoenix, living with defendant's parents. Beck testified that during the time they lived together, she had seen defendant looking through papers on Terrence's desk. She also testified that defendant had mentioned he would get an inheritance if his parents ever passed away.

In 2004, Beck broke off her engagement to defendant. At some point she moved to California, yet remained in contact with defendant. She testified that during the time they were dating, defendant was

spending more money and buying nicer things. In May 2005, Beck inquired about defendant's finances and he replied that he was doing very well at his job. However, Beck also had spoken with Katherine several times in August 2005. As a result of these conversations, Beck checked her credit. During one phone conversation, defendant asked if Beck had been speaking with Katherine. Beck responded, falsely, that she had not been talking with Katherine. According to Beck, defendant responded, "If I ever find out, you are going to get it." Beck asked him if that was a threat. Defendant replied, "It's a fact."

Beck then testified about the week leading up to the night of the murders. She had invited defendant to a concert in Los Angeles. Defendant had agreed to go, and planned to fly to California on September 29. Beck testified defendant had told her his flight left Chicago at 9:30 a.m. and that he would be leaving his house at 6:30 a.m. in order to arrive at the airport in time. On the evening before he was to fly to Los Angeles, defendant called Beck around 11:30 p.m., Central time. Defendant said he had a bad connection, and asked Beck to call him back on his parents' home phone number. Beck did call him, and Terrence answered the phone at first. Defendant then answered another phone in the house, and Terrence hung up. Beck and defendant then had a conversation about his trip to California. The next morning, defendant again called Beck to say that he was running late to the airport because of traffic, but that he was going to be on a later flight. When defendant arrived, Beck asked him what he did on the plane and defendant replied that he slept the entire time. He said he did not know why he was so tired.

Deborah Chereskin, a neighbor of the Hansons, testified that she took her dog out in the backyard at 1:50 a.m. on September 29. Chereskin's backyard abuts the backyard of the Hanson house. Chereskin testified that when she took her dog out, all of the lights in the Hanson house were turned on, including the basement window where defendant's bedroom is located.

State's witnesses then testified regarding the crime scene at the Tsao home. Sergeant Nisha Kalra, an evidence technician and photographer, testified to the layout of the Tsao home, and identified several pictures depicting the location and position of the victims' bodies, a laptop computer, bloodspatters and other forensic evidence. Detective Christopher Berard, of the computer forensics division of

the Naperville police, testified that the hard drive taken from the computer found near James's body was last accessed at 10:43 p.m. on September 28.

Next, Jennifer Williams, sister to both Katherine and defendant, testified as to defendant's spending habits in the months leading up to the murders. Williams also testified to the conversation she had with Katherine six weeks before the murders. In that conversation Katherine told her that defendant had admitted to opening up credit accounts in his parents' names and had charged around $80,000 to these accounts. Defendant had admitted this both to Katherine and to Mary. Defendant promised to pay the money back and asked that Katherine and Mary not tell Terrence. Williams testified that Katherine told defendant she was going to tell Terrence anyway. At that point Katherine told Williams that defendant had threatened her, saying, "If you tell dad I'll fucking kill you." Katherine called Williams that same day to tell her about the confrontation.

Williams testified that Katherine called her again the following day. Katherine called to say she did not go to work because "she was really freaked out" about what defendant had said the day before. Over the next few weeks, Katherine and Williams continued to talk about the situation over the phone, but Williams did not provide any more specifics. Williams also testified that on the night of the murders, Katherine had called her twice, at 10 and 10:06 p.m. Williams was out of the house the first time Katherine called, but Katherine spoke to Williams's daughter. The second time Katherine called, Williams did not answer, as she was getting ready for bed.

The following morning, Williams tried calling Terrence to ask about a home repair issue, but there was no answer. Williams testified she also tried to reach Mary at work, as well as Mary's cell phone and Katherine's cell phone. She called again later in the morning, and then made repeated attempts to call each of them. She also spoke with Bob Stutelberg, and she asked him to drive over to house to check on her parents. Williams testified she also spoke with Mary's coworkers and provided them the entry code for the garage door. Later, from the Tsao home, Mary's coworkers put Williams on the phone with Detective Nilles, of the Aurora police department. During that conversation, Williams told Detective Nilles that she "was really worried because my brother had threatened my sister." Williams

testified as to a copy of Mary's credit report she found when cleaning out Mary's bedroom dresser. The credit report was dated August 13, 2005, which was the day before Katherine called her about defendant's threat.

Lisa Stewart, a custodian of records for Southwest Airlines, testified that the airline's records showed defendant had purchased a ticket from Chicago to Los Angeles, departing at 11:15 a.m. and arriving at 1:30 p.m. A return flight was booked at the same time, for flight on October 2, leaving Los Angeles at 11:15 a.m. and arriving in Chicago at 5:10 p.m. Stewart also attempted to testify to a note included in those records. That note read "if passenger checks in, please contact the LAPD ***. Passenger is very dangerous." This testimony drew an objection from defense counsel and the objection was sustained. Stewart then testified to another reservation defendant had made for a flight on September 30, leaving Los Angeles at 7:15 p.m. and arriving in Chicago at 1:05 a.m. on October 1. Stewart testified defendant did not board either of defendant's booked return flights. Sarah Voss, an airlines record custodian for United Airlines, testified that defendant had booked a flight on September 29, leaving Los Angeles at 11:05 p.m. Voss confirmed that defendant did board this flight.

The State called several witnesses to explain how various evidence samples were collected and how the case was investigated. The witnesses, mainly police officers, testified that bloodstains were found in the Hanson home, that the Hansons' mattress had been switched with a mattress in the guest bedroom, that the murderer had attempted to repair the headboard where bullets had penetrated and that a cordless drill was found. One witness testified that a bullet fragment was found in an attic joist near the Hansons' bed. The State later argued this evidence demonstrated the calculated nature of the crime.

John Collins, a firearms and tool mark expert, testified that the bullet found in the joist matched other bullets found within Terrence and Mary. Collins also testified as to tool marks made in an attempt to repair the headboard of the Hansons' bed and testified that the plastic garbage bag found under Terrence's head came from a box of garbage bags found at the Hanson house. He compared markings on a plastic zip lock bag found in defendant's car, containing green latex gloves, to a box of zip lock bags at the Hanson home, and concluded

that the bag found in the car came from the same manufacturer as the box of bags in the Hanson home.

Dr. Scott Denton, a medical examiner, testified to his autopsies of James and Katherine Tsao. He described in detail the various injuries sustained by both victims. He confirmed that James's and Katherine's deaths were caused by skull and brain injuries as a result of blunt trauma to the head. He also testified that James lacked any indication of defensive wounds. However, Denton did conclude that injuries to Katherine's forearms were defensive wounds. Denton also testified that Katherine's ring finger had been broken. He opined it was broken by being bent backwards. On cross-examination, Denton acknowledged that her ring finger had no indentation from a ring and no cuts or bruises. Denton further testified that he did not know if Katherine was wearing a ring when she was killed.

Similarly, Dr. Jeff Harkey, chief forensic pathologist for the Du Page County coroner's office, testified as to his autopsies of Terrence and Mary Hanson. Harkey concluded that each victim died as a result of a single gunshot wound to the head. Harkey also concluded, based on a stippling pattern on Terrence's head, that a second gunshot was fired near Terrence's head but did not hit him.

Craig Morehouse, a Wisconsin state trooper, testified that he initiated a traffic stop of defendant's vehicle north of Madison, Wisconsin. He further testified that he informed defendant that there was a warrant for his arrest in Illinois, and took defendant to a nearby county sheriff's department.

Reynaldo Rivera, an evidence technician with the Aurora police department, testified that he examined defendant's vehicle after his arrest. Rivera testified he began by taking photographs, and then examined the contents of the vehicle. Specifically, he testified that he found a clear zip lock sandwich bag containing rubber or vinyl gloves. The gloves had a brown, reddish flaky substance on them. Rivera also found a gold Rolex watch in the center console of the vehicle along with a silver, princess-cut diamond ring.

Tamara Camp, a DNA analyst, testified that she tested swabs taken from both crime scenes, as well as from items found in defendant's vehicle the night he was stopped by Wisconsin police. Camp identified several samples that contained DNA profiles

matching those of James and Katherine Tsao and Terrence and Mary Hanson. Profiles matching Terrence and Mary were found both at the Hanson home as well as inside Terrence and Mary's SUV. Camp testified that she identified a DNA profile matching James on the watch found in defendant's SUV. Camp also testified that although she noticed a brown speck on the ring found in defendant's SUV, she was unable to identify a DNA profile. Lastly, Camp testified that stains on the green gloves found in defendant's vehicle tested positive for blood, and that the gloves contained a DNA profile matching that of Terrence.

Michael Nilles, a detective with the Aurora police department, testified as to his investigation of the murders. When he arrived at the Hanson home, he encountered Belinda Robinson, Mary's coworker who had gone to the home to check on Mary. Belinda handed Nilles a cell phone. On the other end of the phone was defendant's sister, Jennifer Williams. Nilles testified that this phone conversation led him to consider defendant a suspect. After that conversation, Mary's nephew, Bob Stutelberg, gave his cell phone to Nilles, telling Nilles that defendant was on the phone. During this conversation, Nilles confronted defendant with, among other things, the statement "Jennifer thinks you did this" and told defendant that he knew defendant had an argument with Katherine over his using his parent's identities to get credit cards. Nilles informed defendant that he was sending two detectives to Los Angeles to meet with defendant. Nilles testified to a series of calls between himself and defendant, including a conversation in which defendant acknowledged being at the airport and Nilles told defendant that it seemed as if he was running from the police, which defendant denied.

Nilles further testified that on Friday morning, September 30, he received a phone call from defendant, who indicated he was still in Los Angeles. However, following a phone call with the FBI, Nilles had reason to believe defendant was actually back in Illinois, and instructed local police agencies to look for defendant traveling north toward Wisconsin. Following defendant's apprehension in Wisconsin, Nilles traveled there and interviewed defendant. Defendant was advised of his *Miranda* rights, which defendant waived. Defendant repeatedly denied being involved in the murders.

The State also questioned several witnesses regarding the GPS

device recovered from defendant's vehicle. The State elicited testimony that tracked the movements of defendant's vehicle on the evening prior to the murders as well as its movements the morning before the bodies were discovered and the following day, when defendant returned to Illinois. Testimony also revealed the device was turned off between 7:30 p.m. the day of the murders and approximately 9:30 a.m. the day after.

During the trial, the State also called several witnesses to establish the basis for the identity theft charges against defendant. As defendant is not challenging the evidence or the convictions on these counts, we need not describe this testimony in detail.

For the defense, Jennifer Cones, a forensic scientist certified as an expert in fingerprint identification and comparison, testified that she examined a fingerprint found on the bag containing bloodstained gloves that was found in defendant's car. Comparing this print to defendant's fingerprints, she concluded that the two did not match. However, on cross-examination, she acknowledged that she did not compare the print to the fingerprints of Terrence and Mary Hanson.

Defendant testified next. He acknowledged that he had used his mother's and father's names in order to secure credit, which he then used to purchase various items. He then admitted that in the middle of August his parents confronted him with credit reports and defendant admitted that he had been charging purchases to these credit cards. According to defendant, he convinced Mary that he would stop and that he would begin to pay her back. When he was separately confronted by Terrence, defendant testified, his father agreed to allow defendant to take out a consolidation loan in Terrence's name, in order to pay off some of the current debt.

Defendant then testified as to his whereabouts the evening of September 28, prior to the murders. He met with Christine Undesser at a bar and returned to his parents' house, where he was living, around 11 p.m. Defendant testified that Terrence was awake in his office when defendant arrived home. Around 11:15 defendant called Allison Beck in Los Angeles. The connection was not good, and defendant asked Allison to call him back on his parents' house phone. When Allison called, Terrence answered, but defendant answered shortly after and told Terrence, "I got it." Defendant then talked to Allison until approximately 11:30. Defendant testified that after this

phone call, he put a movie into his DVD player and fell asleep during the movie, probably around 1:30 a.m.

Defendant testified that the following morning, he woke up, went to a convenience store to buy cigarettes, took a shower, finished packing for his trip to Los Angeles and left the house. He testified he planned on driving to James and Katherine's house in order to return Katherine's wedding ring and the watch belonging to James. According to defendant, Katherine had taken the ring off while painting some flower pots. As for the watch, defendant testified that Katherine had wanted to order Terrence a watch and needed to know how many links were needed for the chain. According to defendant, Katherine was going to order the watch because Terrence did not always do things in a timely fashion. If Katherine helped get the right measurements, she would order the watch so Terrence would not have to do anything. Katherine had James's watch in order to compare it to Terrence's wrist for sizing purposes and defendant testified that Katherine left the watch at the Hanson home. Defendant testified that although he intended to return the items before he went to the airport, he was in a hurry to get to the airport and forgot to stop by their house.

On the way to the airport, defendant realized that he did not have his driver's license and that he was not going to be able to get to his flight on time. He returned to his parents' home to get his license and called to book a new reservation to Los Angeles. On his second attempt to get to the airport, defendant called Bob Stutelburg to ask where to park and whether he thought defendant would be able to make his flight in time. Defendant testified that he did get to the airport in time and boarded his flight to Los Angeles. While in Los Angeles, defendant learned from Stutelberg that there were four persons dead in James and Katherine's house. Defendant denied killing any of the victims.

The jury returned a verdict of guilty as to all four counts of first degree murder. The jury also found defendant guilty of the armed robbery of James and Katherine Tsao and of the aggravated kidnapping of Terrence and Mary Hanson. The jury found defendant guilty of the identity theft of Terrence and Mary Hanson.

In the eligibility phase of defendant's sentencing trial, the jury returned a verdict finding defendant to be eligible for a death sentence.

-11-

The verdict was based on defendant being 18 years or older at the time of the murders and that the deaths were a result of the intent to kill more than one person, the murders were committed in a cold, calculated and premeditated manner pursuant to a preconceived plan scheme or design, James and Katherine were killed in the course of an armed robbery and Mary and Terrence were killed in the course of an aggravated kidnapping.

At the sentencing hearing itself, the State first argued that the fact there were multiple victims and the fact that the murder was committed in a calculated and premeditated manner were both sufficient aggravating factors. The State also argued that defendant's criminal history, which included home invasions, retail theft and property damage, was an aggravating factor. The State referred to testimony from witnesses detailing other incidents involving violence and threats made by defendant. Lastly, the State asked the jury to consider the impact statements of the victims' family members.

In mitigation, counsel for defendant argued that the murder was committed while defendant was under the influence of an extreme mental or emotional disturbance. Defendant relied primarily on the testimony of Dr. Dawkins, who concluded that defendant would not be a risk of harm to others in a structured environment such as prison.

After weighing the evidence in aggravation and mitigation, the jury returned a verdict that death was the appropriate sentence. The court declined to enter a written order setting forth a basis for disagreement with the jury's verdict, as permitted by section 9–1(g) of the Criminal Code of 1961 (720 ILCS 5/9–1(g) (West 2006)). Instead, the circuit court concurred in the decision of the jury and sentenced defendant to death. The court found that the convictions for armed robbery and aggravated kidnapping merged into the convictions for murder and so did not enter sentences on those counts. The circuit court did sentence defendant to concurrent terms of 15 years for defendant's identity theft convictions.

Pursuant to Supreme Court Rule 603 and section 9–1(i) of the Criminal Code, defendant now appeals directly to this court. 134 Ill. 2d R. 603; 720 ILCS 5/9–1(i) (West 2006).

-12-

ANALYSIS

On appeal to this court, defendant raises nine arguments. These arguments relate to both the guilt and sentencing phases of his trial and challenge the constitutionality of the death penalty statute itself. We address each in turn, supplementing each analysis with additional facts from the record when necessary.

I. Forfeiture by Wrongdoing

Defendant's first argument is that the circuit court erred in admitting the testimony of Jennifer Williams relating to a conversation Jennifer had with her sister, Katherine. In that conversation, Katherine mentioned that defendant had threatened her. Prior to trial, the State filed a motion to forfeit defendant's right to cross-examine these statements made by Katherine. The State argued that defendant sought to prevent Katherine from serving as a witness against him and did so by killing her. In a hearing on the State's motion, Jennifer's testimony was consistent with the testimony she would later give at trial. Katherine phoned her shortly after she and Mary had confronted defendant about the credit cards he had obtained in Mary's name. Defendant had admitted to Mary and Katherine that he had gotten the credit cards issued and had run up debt. He also promised he would pay the money back to his parents. At that time Mary and Katherine agreed that neither of them would tell Terrence about what defendant had done.

After Mary had left the room, however, Katherine told defendant that she would tell Terrence about defendant's scheme. Katherine told Jennifer that defendant responded by saying, "If you tell dad, I will fucking kill you." Jennifer testified that Katherine was very upset during the phone conversation. Jennifer urged Katherine to tell Terrence what had happened, but Katherine demurred, saying she had promised Mary not to tell Terrence.

When Jennifer had a second conversation with Katherine the next day, Katherine said she "had a very unsettling feeling about what Eric had said." She told Jennifer that she had stayed home from work and turned on her home security system. Lastly, Jennifer testified that she had found a printout of a credit report in Mary's name. The report had Mary's handwriting on it, and the report was found in Mary's dresser

drawer. Several items on the report were circled and other had question marks next to them.

On cross-examination, Jennifer acknowledged that she did not know why Katherine would tell defendant she was going to tell Terrence what defendant had done, but then tell Jennifer that she would not be telling Terrence. She also admitted that she did not call the police after Katherine told her about defendant's threat, but explained that she was trying to honor what Katherine had asked, that she not tell anyone else.

At the hearing, the State also proffered testimony which tracked what would eventually be its case in chief. This testimony included the estimated timeline of the murders, defendant's whereabouts the day of, and days following, the murders and a summary of the forensic evidence discovered at the scene of the murders. The State also referred to a letter from defendant to Bob Stutelberg in which defendant reported that he had told Katherine to stay out of his business and out of his life. Further, he told Katherine that if she did not, she would "regret it." According to the letter, Katherine responded by asking if defendant was threatening her. Defendant responded, "No, I'm promising."

Arguing the motion, the State admitted that Katherine's statements to Jennifer were hearsay. However, pursuant to the doctrine of forfeiture by wrongdoing, defendant had forfeited his right to cross-examine Katherine on those statements. The State argued that it had proved, by a preponderance of the evidence, that defendant committed a wrongdoing, murdering Katherine with the intent to undermine the judicial process or destroy the integrity of the criminal justice system by keeping Katherine from going to the police or testifying against him.

Defendant argued in response that the State had not proven any wrongdoing. Specifically, defendant questioned whether one person could have committed these murders, and could not demonstrate that defendant was in the Tsao home at 10:43 p.m. when the laptop was accessed for the last time. Defendant also challenged the State's forensic evidence as insufficient to prove any wrongdoing.

The circuit court concluded the State had proved forfeiture by wrongdoing by a preponderance of the evidence. The court

specifically found that the State proved defendant committed the murder and proved that defendant did so with the intent to make Katherine unavailable as a witness. The court, therefore, granted the State's motion and allowed Jennifer's testimony to be introduced at trial.

In reviewing this issue, we first note that the State argues defendant has only challenged the circuit court finding that, by a preponderance of the evidence, defendant made Katherine unavailable. Defendant conceded at oral argument that he is not challenging the finding that he acted with the intent to make Katherine unavailable. Therefore, we will not review this finding concerning intent.

Instead, we address defendant's contention that the circuit court erred by admitting Jennifer's testimony because the doctrine of forfeiture by wrongdoing does not permit admission of nontestimonial hearsay. Defendant also suggests that even if nontestimonial hearsay may be admitted under the doctrine, the reliability of the statements must be considered in the admission decision. Lastly, defendant argues that the State's proffered testimony was insufficient to prove by a preponderance of the evidence that defendant committed Katherine's murder.

A reviewing court will not reverse the circuit court's ruling on a motion *in limine* absent an abuse of discretion. *People v. Kirchner*, 194 Ill. 2d 502, 539 (2000). However, defendant is not arguing the circuit court abused its discretion. Rather defendant argues that the court had no discretion to admit Jennifer's testimony because the forfeiture by wrongdoing doctrine requires that the statements be testimonial and because the statements must show some measure of reliability. Defendant correctly argues that these questions are ones of law to be reviewed *de novo*. *People v. Caballes*, 221 Ill. 2d 282, 289 (2006).

The doctrine of forfeiture by wrongdoing is a common law doctrine. As early as 1878, the United States Supreme Court acknowledged that if "a witness is absent by [a defendant's] own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away." *Reynolds v. United States*, 98 U.S. 145, 158, 25 L. Ed. 244, 247 (1878). The doctrine was later codified, at the federal level, by Federal Rule of Evidence 804(b)(6) as an exception to the general hearsay

rule. Fed. R. Evid. 804(b)(6). More recently, the Supreme Court, in *Crawford v. Washington*, recognized that the forfeiture by wrongdoing doctrine, in addition to serving as an exception to the hearsay rule, also "extinguishes confrontation claims on essentially equitable grounds." *Crawford v. Washington*, 541 U.S. 36, 62, 158 L. Ed. 2d 177, 199, 124 S. Ct. 1354, 1370 (2004). In *People v. Melchor*, our appellate court first recognized Rule 804(b)(6) as the law of Illinois. *People v. Melchor*, 362 Ill. App. 3d 335, 345 (2005).

This court confirmed the appellate court's recognition of the doctrine in *People v. Stechly*, 225 Ill. 2d 246, 268-69 (2007). However, defendant argues that *Stechly* adopted the doctrine only in the context of testimonial statements to be analyzed under *Crawford*.

The doctrine of forfeiture by wrongdoing is not limited to evidentiary questions that raise *Crawford* concerns. Rather, Rule 804(b)(6) is a general exception to the hearsay rule. We have already expressed that the rule is coextensive with the common law doctrine. *Stechly*, 225 Ill. 2d at 272-73. This conclusion is based on the Supreme Court's acknowledgment that Rule 804(b)(b) codifies the forfeiture doctrine. *Davis v. Washington*, 547 U.S. 813, 833, 165 L. Ed. 2d 224, 244, 126 S. Ct. 2266, 2280 (2006). Therefore, although left unsaid in *Stechly* as a matter of Illinois law, we now expressly recognize that the doctrine serves both as an exception to the hearsay rule and to extinguish confrontation clause claims.

Traditionally, most hearsay exceptions allow the admission of nontestimonial evidence. *Crawford*, 541 U.S. at 56, 158 L. Ed. 2d at 195, 124 S. Ct. at 1367. Defendant provides no argument, other than a possible lack of reliability, for why the forfeiture by wrongdoing doctrine should not also permit nontestimonial statements. As we next discuss, lack of reliability is an insufficient rationale. Therefore, we hold that the doctrine may be applied to admit both testimonial and nontestimonial statements.

Turning to reliability, defendant misapprehends the purpose of the forfeiture by wrongdoing doctrine by arguing for requiring indicia of reliability. Had Katherine not been made unavailable by defendant's wrongdoing, she might have testified as to the threat defendant made against her. Defendant would have then had an opportunity to test Katherine's reliability by cross-examining her, perhaps asking why she did not go to police if she really thought she was in danger. He could

have also asked whether she fabricated the threat because she was angry with defendant. Under the circuit court's findings, however, defendant forfeited his ability to challenge the reliability of Katherine's statements by improperly preventing her from testifying. Requiring additional indicia of reliability would, therefore, undermine the equitable considerations at the center of the doctrine.

Nor is reliability a significant consideration with respect to Jennifer's testimony relating her conversation with Katherine. Unlike Katherine, Jennifer was present and able to testify. Thus, defendant had every opportunity to demonstrate that Jennifer was exaggerating, or even fabricating, the conversation she had with Katherine. Defendant cross-examined Jennifer, pointed out to the jury the seemingly contradictory dates given for the phone conversation and asked Jennifer why, if she thought Katherine was upset and serious about the threat, she did not call the police after the conversation. Notwithstanding such arguments, a reasonable jury could conclude, and we can presume did conclude, that Jennifer was telling the truth and that Katherine indeed reported that defendant had threatened her. The jury was aided in this effort by the State's entering into evidence defendant's letter, and the credit report found in Mary's bedroom, which could be construed to support the conclusion that Jennifer was reliably relaying what Katherine had told her.

In summary, the forfeiture by wrongdoing doctrine by its application obviates the need to consider reliability. Under the doctrine, defendant had the opportunity to challenge the reliability of Jennifer's testimony through cross-examination. Further, by his own wrongdoing, defendant forfeited his right to challenge the reliability of Katherine's statements to Jennifer. Accordingly, we hold that so long as the declarant's statements are relevant and otherwise admissible, statements admitted under the forfeiture by wrongdoing doctrine need not reflect additional indicia of reliability. Additionally, based on the testimony elicited at the hearing, discussed above, we cannot say that the circuit court's finding that defendant caused Katherine to be unavailable was arbitrary or unreasonable. The circuit court, therefore, did not abuse its discretion in granting the State's motion to allow Jennifer's testimony.

## II. Jennifer's Statement to Police

Defendant next argues that the circuit court erred in admitting testimony by Detective Nilles that defendant's sister, Jennifer, believed defendant had committed the murders. Defendant contends that this testimony constituted improper and irrelevant opinion evidence. The State responds first that defendant has waived any claim of error on this issue, and even if the issue is not waived, the testimony was admissible to demonstrate the course of the criminal investigation and defendant's reaction to Nilles's comment, and provided context for explaining defendant's subsequent flight from police.

We address the State's waiver argument first. The State cites *People v. Caffey* for the proposition that "[w]hen a defendant objects to certain testimony on direct examination, but then questions the witness on cross-examination concerning that allegedly inadmissible testimony, any error is waived for purposes of appeal." *People v. Caffey*, 205 Ill. 2d 52, 113 (2001). In *Caffey*, a witness testified he overheard another person name four persons as burglars who had entered that person's home. On cross-examination, defense counsel confronted the witness with the fact that he had not mentioned the above statement to police when he was first interviewed. On redirect, the State elicited testimony, over defense objection, that the witness had told police about this statement during a subsequent interview. Defense, on recross, attempted to demonstrate that the witness had consulted with another witness between the two police interviews, rendering the statement at the second interview suspect. On appeal, defense counsel argued that admitting evidence of the second interview was error. This court concluded that defendant had waived that issue because defendant himself continued to question the witness regarding the same testimony to which defendant had objected. *Caffey*, 205 Ill. 2d at 113.

Defendant argues, however, and we agree, that this case more closely resembles *People v. Brown*, 172 Ill. 2d 1 (1996). In that case, the trial court ruled against the defendant on his motion *in limine* to prevent admission of testimony as to defendant's involvement with gangs. At trial, the defendant responded to the State's evidence by calling witnesses who testified they had never known the defendant to have been involved with any gang. *Brown*, 172 Ill. 2d at 48. We concluded that the defendant did not waive appeal of the court ruling

-18-

on the defendant's motion *in limine*. The defendant had only pursued that line of questioning "in response to the trial court's adverse disposition" to his motion. *Brown*, 172 Ill. 2d at 48. The defendant "apparently sought to blunt the impact" of the State's anticipated evidence. *Brown*, 172 Ill. 2d at 48.

When a circuit court makes an adverse evidentiary decision, defense counsel cannot be forced to choose between waiving an issue for appeal and allowing damaging testimony to go unanswered on cross-examination. Forcing such a choice undermines counsel's ability to fully and vigorously pursue a client's interests. Accordingly, we conclude that defendant has not waived this issue and address the merits of defendant's claim.

As noted above, it is within the circuit court's discretion to determine whether evidence is relevant and admissible. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001). A decision to admit evidence, therefore, will not be overturned unless it is arbitrary, fanciful or unreasonable. *Morgan*, 197 Ill. 2d at 455.

The testimony at issue is Detective Nilles's assertion, during a conversation with defendant, that "Jennifer thinks you did this." Also relevant to this discussion is Jennifer's testimony, elicited by defendant, that she had indeed made that statement to Detective Nilles.

Defendant first asserts that the testimony at issue was improper opinion testimony. We disagree. Detective Nilles did not testify that he believed defendant was guilty. Nor did Jennifer testify that she believed defendant was guilty. Rather, both Nilles and Jennifer testified to a statement which indicated, at the time the statement was made, that Jennifer thought defendant had caused the victims' deaths. At no time was any testimony offered as to Jennifer's present opinion of defendant's guilt or innocence. Thus, while defendant may arguably challenge the testimony as to relevance and hearsay concerns, we reject defendant's argument that this testimony constituted improper opinion testimony.

Regarding relevance, we conclude that the evidence was relevant in that it provided some context for why the investigation was focusing on defendant. Defendant, in an earlier phone conversation, had asked on at least one occasion why Detective Nilles was "asking

-19-

him these types of questions." The information that "Jennifer thinks you did this," based on her remembering Katherine telling her about defendant's earlier threat, was part of the reason for the questions. Nilles later testified that he mentioned several things to defendant to let him know why he was sending detectives to meet him in Los Angeles, and why it was important that defendant and Nilles speak to each other in person later. Lastly, the State argues, and we agree, that Nilles's testimony that "Jennifer thinks you did this" was relevant for interpreting defendant's subsequent actions, such as his unannounced return to Illinois, and his drive through Wisconsin. The jury could have found that the fact that defendant knew his sister had told police about his argument with Katherine, and had indicated she thought defendant could have committed the murders, made it more likely that defendant felt the need to flee the police and avoid being arrested.

Defendant's hearsay arguments are also unconvincing, for many of the same reasons. An out-of-court statement is admissible if it is offered for some purpose other than to establish the truth of the matter asserted and does not constitute hearsay. *People v. Banks*, No. 103933, slip op. at 16 (February 19, 2010). In this case, the State did not seek to admit Jennifer's statements to prove that defendant was guilty or even to prove that Jennifer thought defendant was guilty. Instead, Detective Nilles's testimony provided context for his investigation and for testimony pertaining to defendant's state of mind based on defendant's response to Nilles's questioning.

As Nilles's testimony was not improper opinion, was not irrelevant and was not inadmissible hearsay, the only question remaining is whether the testimony was nonetheless unduly prejudicial to defendant. A court may exercise its discretion and exclude evidence, even if it is relevant, if the danger of unfair prejudice substantially outweighs any probative value. *People v. Walker*, 211 Ill. 2d 317, 337-38 (2004). However, in this case, we conclude that the decision by the circuit court to deny defendant's motion *in limine* and allow Nille's testimony was not arbitrary, fanciful or unreasonable, and was, therefore, not an abuse of discretion. We agree with defendant that evidence that a witness believes a defendant is guilty may be unfairly prejudicial. Defendant cites *People v. Crump*, 319 Ill. App. 3d 538 (2001), as an example. In that case, it was considered reversible error for a police officer to testify he believed the defendant was guilty.

However, in this case, as we have noted above, no witnesses testified as to their belief that defendant was guilty. Further, the prejudice arising from such testimony does not substantially outweigh its probative value. In *Crump*, the testimony was "especially prejudicial because, as an authority figure, he was informing the jury that it should believe a portion of the prosecutor's case." *Crump*, 319 Ill. App. 3d at 544. In contrast, this court has held that the testimony of a defendant's sister-in-law that the defendant did not have a compliant personality and "did whatever he wanted to do" was not overly prejudicial. *People v. Kidd*, 175 Ill. 2d 1, 36 (1996).

In this case, although defendant suggests that a jury would find Jennifer to be "uniquely knowledgeable" about defendant's character, we cannot conclude that the indirect reference to Jennifer's initial opinion of defendant's involvement is so prejudicial as to substantially outweigh the probative value of the statement, as identified above. Therefore, we hold the circuit court did not abuse its discretion in admitting the testimony of Detective Nilles.

### III. References to Defendant's "Dangerousness"

During defendant's trial, the State called as witnesses two airline employees who had been in contact with defendant in Los Angeles the day after the murders. During that testimony, the State first questioned Lisa Stewart, the airline records custodian, as follows:

"[Prosecutor]: Now, if you page forward to 4991 [of the airline computer records]. What is that sheet called?

[Stewart]: This is the remarks page. The gate agent or ticket agent has access to the reservation records and can put remarks in the reservation record.

Q. And were remarks typed in to that sheet, that remark sheet, at about 7:00 that night?

A. Yes.

Q. And that would be September 29th?

A. Yes, that's correct.

Q. And what were those remarks?

A. Some of them were abbreviated, but I can read it to you. It says if passenger checks in, please contact the LAPD

at (310) 4– excuse me, 646-2255 ASAP. Passenger is very dangerous.

> [Defense Counsel]: Objection. Your Honor.
>
> THE COURT: Sure. Sustained.
>
> [Prosecutor]: There were–
>
> THE COURT: And you're not to consider that in any way."

Later, the State questioned Lynnly Taylor, the ticket agent who sold defendant an airline ticket on September 29. Taylor twice referred to the computer records notation. The first time, the State asked "Was there any information that was put into the ticketing computer at Southwest?" Taylor responded, "Yes, there was a comment put in by another Southwest agent, you know, this person could be potentially dangerous." Defense counsel did not object to this response.

Later, in asking Taylor to identify the records so that they could be admitted into evidence, the State asked, "Can you tell the jury what that is?" Taylor responded, "It's a remark in the reservation record for Eric Hanson, the notation says that the passenger is dangerous." Defense counsel objected and the objection was sustained. The court then gave the following instruction:

> "You're not to consider that for the truth of the matter. You're only to consider that only insofar as it explains what she did in talking to her supervisor, but you can't consider it as being a truthful statement just insofar as it explains what she did. So, again, you can't consider it for the truth of the matter."

Defendant's argument as to this testimony is that he was denied due process and effective assistance of counsel as a result of the airline agents' mentioning that the Los Angeles police department considered defendant "dangerous." Defendant argues trial counsel was deficient in failing to consistently object to this testimony or in failing to seek a motion *in limine* to exclude the testimony. The State responds that two of the three references to defendant's dangerousness were cured by sustained objections accompanied by limiting instructions, which also avoided any prejudice against defendant for the one reference to which defense counsel did not object.

-22-

We analyze ineffective assistance of counsel claims under the two-part test established by *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To satisfy *Strickland*, defendant must first show that defense counsel's performance was deficient, in that it fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Defendant must also show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

After reviewing the record, we cannot say that counsel's performance fell below an objective standard of reasonableness. We turn first to defendant's assertion that counsel should have filed a motion *in limine* seeking to exclude any reference to the notes contained in the airline's computer record. Although defendant argues that a motion *in limine* would have prevented the jury from hearing the testimony, we do not agree that the testimony would have been excluded.

Had a motion *in limine* been brought, we agree that the proper ruling would have prevented reference to the notes found in defendant's computer record when testified to by Lisa Stewart, the records custodian. In reaching this conclusion, we assume that the circuit court would have exercised its discretion by granting or denying the motion based on whether the rules of evidence require exclusion. However, we note that even if the rules of evidence require exclusion, a circuit court nonetheless has the discretion to deny the motion and require the moving party to object at trial.

Here, the notes, as referenced by Stewart, had no admissible nonhearsay purpose. Also, as the court correctly concluded at trial, the State had failed to meet the requirements to admit the notes under the business record exception to the hearsay rule.

However, any attempt to completely exclude the notes as they related to Lynnly Taylor's testimony would not have been properly granted. At trial, the State elicited from Taylor testimony on the notes twice within a short time period. Both mentions were related to how Taylor later recognized defendant's name, and informed her actions following her brief encounter with him. The content of the notes, although hearsay, were admissible for this nonhearsay purpose.

Therefore, the hearsay nature of the notes alone would not have permitted the circuit court to grant a motion *in limine*.

The only other way defense counsel could have succeeded in a motion *in limine* would be if the prejudice to defendant of admitting the testimony substantially outweighed its probative value. In this case, the notes regarding defendant's potential "dangerousness" were not so prejudicial as to weigh against its admission. This trial centered around four murders. The jurors had already heard testimony that police were interested in defendant as a suspect. They were aware that Nilles had sent detectives to Los Angeles to look for defendant, and that local police in California were also involved. Jurors likely were not surprised to learn that, during a murder investigation, the Los Angeles police department had made a note to consider the suspect dangerous. We conclude that any prejudice to defendant was minimal, and the court would have been correct to deny the motion on prejudice grounds.

Had a motion *in limine* been filed, then, defense counsel likely would have succeeded only in preventing one mention of the notes. Further, the notes would have been later admitted anyway, albeit for a limited purpose. We cannot say that the decision to object at trial, rather than file a motion, was so unreasonable as to constitute deficient performance.

Nor was defense counsel's performance at trial deficient. Defense counsel promptly objected to the first mention of these notes, by Stewart. The objection was sustained and the court properly ruled that the remarks could not be considered by the jury in any way. Later, during Taylor's testimony, the court sustained defense counsel's objection to the third mention of the notes and offered a limiting instruction that the notes were only to be considered "insofar as it explains what [Taylor] did in talking to her supervisor." The limiting instruction could have been clearer, but it was sufficiently clear to inform the jury that it could consider the statement as evidence for why the agent called her supervisor, but not as evidence that defendant was actually dangerous. Thus, although defense counsel failed to object at the second mention of the notes, doing so would not have prevented that evidence from being admitted. At best, defendant could have received a limiting instruction, likely a similar instruction as given by the court a few minutes later. The failure to object to this

one mention, when the testimony would have nonetheless been admitted and when the jury was subsequently instructed as to the limited purpose for which the testimony could be considered, does not constitute performance by counsel that fell below an objective standard of reasonableness. Therefore, we hold that defendant was not deprived of effective assistance of counsel.

IV. Aggravated Kidnapping Convictions

Defendant next argues that the State did not prove the elements of aggravated kidnapping. The State's brief did not directly respond to defendant's arguments as to the sufficiency of the evidence and at oral argument it conceded, without explanation, that the aggravated kidnapping conviction should be vacated. Because defendant's conviction for aggravated kidnapping ultimately merged with the murder conviction and he was not sentenced on that conviction, and because defendant challenges the conviction exclusively to argue that it improperly affected the jury's sentencing verdict, we need not consider the sufficiency of the evidence in this case. Instead, without reaching the merits of defendant's argument, we accept the State's concession and proceed to examine whether, as defendant contends, the conviction for aggravated kidnapping was improperly considered by the jury in determining that death was an appropriate sentence.[1]

The Supreme Court has concluded that "[a]n invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." (Emphasis in original.) *Brown v. Sanders*, 546 U.S. 212, 220, 163 L. Ed. 2d 723, 733, 126 S.

---

[1]Defendant does not argue that the aggravated kidnapping conviction requires the jury's eligibility verdict to be set aside. An invalid statutory factor will not impair an eligibility finding as long as a separate, valid aggravating factor supported eligibility. *People v. Williams*, 193 Ill. 2d 306 362-63 (2000). As the State notes, the jury found two other aggravating factors supporting eligibility, and defendant does not challenge either of those factors. Therefore, eligibility is not at issue.

Ct. 884, 892 (2006).

In *Brown*, the Court invalidated two of the four eligibility factors that the jury considered in determining whether a death sentence was appropriate. Nonetheless, in addition to the "special circumstances" sentencing factors, the California statute included a sentencing factor allowing aggravating weight to be given to " '[t]he circumstances of the crime of which the defendant was convicted in the present proceeding.' " *Brown*, 546 U.S. at 222, 163 L. Ed. 2d at 734, 126 S. Ct. at 893, quoting Cal. Penal Code Ann. §190.3 (West 1999). The Court concluded that this additional factor permitted the jury to consider all of the same aggravating facts and circumstances presented under the invalidated factors. *Brown*, 546 U.S. at 224, 163 L. Ed. 2d at 735, 126 S. Ct. at 894.

The Illinois death penalty statute has a similar additional sentencing factor. In capital cases in Illinois, the court shall instruct the jury "to consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty. Aggravating factors may include but need not be limited to those factors set forth" in the death penalty statute. 720 ILCS 5/9–1(c) (West 2006). In this case, the jury was instructed that it should consider "all the aggravating factors supported by the evidence" even if "such aggravating factor is not a factor specifically listed in the[ ] instructions." Thus, citing *Brown*, the State argues that the facts upon which the aggravated kidnapping charge was based could be considered by the jury to give aggravating weight under this "catch-all" sentencing factor.

Defendant argues the line should be drawn more narrowly. He argues that the evidence relating to the kidnapping, that Terrence and Mary had living, beating hearts at the time they were moved, would not have otherwise been admitted and, therefore, could not have otherwise been considered by the jury in the "catch-all" category. We disagree.

Defendant's argument suggests that the jury would not have otherwise heard testimony relating to the aggravated kidnapping charge had it not been charged or had it been disposed of on a motion for a directed verdict. Specifically, defendant asserts the jury would not have heard evidence that defendant moved living persons with beating hearts. As *Brown* indicates, "[i]f the presence of the invalid

sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal \*\*\* ." *Brown*, 546 U.S. at 220-21, 163 L. Ed. 2d at 733, 126 S. Ct. at 892. However, this did not occur in this case.

Facts adduced at trial relating to the aggravated kidnapping charge were not extensive. The State elicited on direct examination from Dr. Harkey only that the cause of death of both Terrence and Mary was a gunshot wound to the head. The State did not ask about time of death and did not ask for Dr. Harkey's opinion on when Terrence and Mary were moved. Indeed, it was defense counsel who asked Dr. Harkey about the time of death. Dr. Harkey responded by acknowledging that Terrence and Mary likely were immediately brain dead, but that their hearts could have continued beating for seconds or minutes afterward. The State did not submit Dr. Harkey to any redirect examination.

The State, however, did elicit testimony from several witnesses supporting its theory that Terrence's and Mary's bodies had been moved from the house where they were shot to the Tsao home. Thus, the jury was presented with evidence that Terrence and Mary were shot in their home. The jurors were presented with evidence, elicited by the defendant, that Terrence's and Mary's hearts may have been beating for, at most, a couple of minutes and that they were at some time moved to the Tsao home.

As for argument, we note that in closing argument of the guilt phase of defendant's trial, the State did not reference the aggravated kidnapping. The State also failed to argue aggravated kidnapping during its initial argument of the eligibility phase, other than to say:

> "As to Mary and Terry, aggravated kidnapping, was that committed during the course of a felony? He shot them and he moved them to the other house. Why? It's a continuing course of conduct, one act. He did not want the two scenes to be connected. That is why he shot them and brought them over to the other house. That murder was committed in the course of another felony. Mary and Terry were both killed during the course of another felony, aggravated kidnapping.
>
> \* \* \*
>
> That the murders of Mary and Terry Hanson were

committed in the course of an aggravated kidnapping. \*\*\*
They were killed in their bed, and they were transported over, with one purpose, to cover up the crime scene. It was part and parcel of the whole continuing course of conduct."

Defense counsel then argued that a person cannot be kidnapped when they are dead. Counsel referred to the testimony by Dr. Harkey that Terrence and Mary were already brain dead when they were moved. In rebuttal argument during the eligibility phase, the State then argued that Dr. Harkey did say Terrence's and Mary's hearts could have still been beating, but acknowledged that he did not know whether this was so, and did not know the exact time the bodies were moved.

We cannot say that the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it. The jury was presented with the entire sequence of events, from the shooting to the cleanup to transporting of the Hansons to the Tsao home. The jury was entitled to give those facts and circumstances aggravating weight under the "catch-all" sentencing factor. Therefore, we hold that the improper conviction for aggravated kidnapping does not require reversal of defendant's death sentence.


V. Testimony in Aggravation

During the sentencing phase of defendant's trial, defendant called Roger Cowan, a former prison warden, to testify as to what defendant might expect to experience if he were sentenced to natural life in prison. During the course of that examination, the following exchange occurred:

"[Defense counsel]: Now, let's say you have someone who becomes–or someone who perhaps tries to stab another inmate or someone who tries to take out a guard, certainly there's something more penal than something like taking away their radio. What would Menard do with a person like that?

[Witness]: Well, yes, the grade system is to deal with the minor rule infractions. Any major rule infraction he would be placed in segregation and for a lack of another term, that a jail inside the jail, the segregation unit, where he would be locked

up 24 hours a day. And any time he comes out of his cell, he'd be escorted; and there would be a number of restrictions that would be imposed."

On cross-examination, the State referenced this inquiry and asked Cowan about three specific instances where an inmate killed a corrections officer at a maximum security prison. That exchange went as follows:

"[Prosecutor]: [Defense counsel] mentioned something. He said let's say someone takes out a guard, do you recall that question?

[Cowan]: Takes out a guard?

Q. Yeah.

A. Assaults an employee or guard?

Q. Right. And his words were take out a guard.

A. Okay. Yes.

Q. And you were the Captain of Corrections; is that correct? You held that office?

A. Yes, I did.

Q. And that was for–between 1981 and 1986 at Menard, correct?

A. Yes, it is.

Q. And between 1981 and 1986, would you tell the jury how was it that a Correctional Officer Joseph Cushman got killed?

A. Actually Joseph Cushman was a guard at a medium security facility called a farm annex. And an inmate struck him in the head with an ax and killed him at the farm annex.

Q. How about Cecile Harvison who got killed in 1984?

A. In 1984 Officer Harvison was killed coming off of the four gallery in the south cell house. An inmate charged out of his cell while the evening dining room doors were open and he attacked Officer Harvison with a knife and stabbed him to death at the four gallery grill door.

* * *

Q. And you're probably familiar with the most recent

-29-

[killing of an officer] in 2007, correct?

    A. No. I'm not that familiar with that; but now that you say that, I did read where there was an incident at Stateville, yes."

Defendant argues that this testimony was irrelevant and should not have been admitted. Defendant acknowledges that counsel did not object to this testimony at trial. Therefore, he asks this court to review the record for plain error or, in the alternative, to hold that defendant was denied effective assistance of counsel.

The plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step in this analysis, therefore, is to determine whether a clear and obvious error occurred.

The ostensible purpose of defendant's questioning of Cowan was to demonstrate that defendant would not be a danger to others if he were sentenced to natural life in prison rather than be given a death sentence. Elsewhere in Cowan's testimony, he stated that there have been only three instances where an inmate has gotten outside the wall of Menard state prison. Cowan also noted that each of these three individuals had been apprehended. From this testimony, jurors could infer that defendant likely would not escape to again pose a danger to the public. From Cowan's testimony as to the penalties for "taking out" a guard, the jury was to infer that defendant would not be a danger to prison employees, either.

For this reason, the State argues that defendant opened the door to its questioning Cowan about specific instances of inmate violence. The purpose of the State's questioning was to clarify how frequent an occurrence it is for an inmate to kill a corrections officer even when there are strict punishments for doing so. Therefore, the State argues there was no error and, consequently, no plain error. We agree with the State that admission of this testimony did not constitute error.

-30-

Although it is error for the State to speculate as to the possibility that defendant will commit future crimes (*People v. Edgeston*, 157 Ill. 2d 201, 241 (1993)), we conclude that the State made no such speculation in this case. On direct examination, defendant did not seek to demonstrate that he, himself, would not be prone to violence. Rather, Cowan's testimony concerned general statements that regulations and the threat of further punishment are in place to provide incentives for inmates to refrain from violence. Likewise, the State's questioning emphasized that such regulations will not work under all circumstances. The State refrained from questioning Cowan about whether defendant himself was likely to harm prison officers. Rather, it limited itself merely to demonstrating that the threat of stricter confinement alone does not always prevent inmate violence. Additionally, the State made no reference to defendant's future dangerousness in closing argument. Based on the generalized nature of the questioning and the lack of any argument as to defendant's future dangerousness, we conclude that it was not a clear and obvious error for the court to allow Cowan's testimony to be admitted. Finding no error, our plain-error analysis ends here.

Similarly, we find no merit in defendant's ineffective assistance claim. As noted above, to demonstrate ineffective assistance of counsel, defendant must show that defense counsel's performance was deficient, in that it fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Defendant must also show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Having concluded that it was not error for the court to allow Cowan's testimony, the failure to object to this testimony cannot constitute deficient performance and cannot result in prejudice to defendant. Thus, we hold that defendant's ineffective assistance of counsel claim must also fail.


VI. Fifth Amendment Challenge

Defendant next argues that the circuit court's instruction to the jury that recognized defendant's right to remain silent and not submit to an interview by a prosecution psychologist penalized defendant by indicating that mitigation could have been rebutted had defendant

agreed to such an interview. The State responds that this issue has been forfeited because defendant failed to object to the instruction and affirmatively contributed to the instruction's content.

During the closing arguments of the sentencing phase of defendant's trial, counsel for defendant referenced the testimony of Dr. Marva Dawkins. Dawkins testified as an expert in clinical and forensic psychology and gave the opinion that defendant had attention deficit hyperactivity disorder. Dawkins suggested that although prison life would be difficult for defendant, prison structure would control his behavior. In referencing this testimony defense counsel argued that Dawkins' testimony was "unrebutted" and "unchallenged by any other expert." Counsel also argued that the State could have hired an expert and that "Eric would have had to subject himself to those interviews." Counsel's statements prompted several objections by the State, which were overruled. The State requested a sidebar, where the parties discussed whether the State could have required defendant to give an interview to a prosecution psychologist. The State cited *People v. Lee*, 196 Ill. 2d 368 (2001), which held that a defendant in a capital case may not be required to submit to an interview by a State expert. *People v. Lee*, 196 Ill. 2d at 382.[2] The circuit court agreed to instruct the jury that defendant could not be forced to submit to an interview. Defense counsel then asked the court to also instruct the jury that the State could have hired an expert to review Dawkins' findings, but that the State chose not to do so. The circuit court agreed and instructed the jury as follows:

> "Ladies and gentlemen, good afternoon. I'm just going to clarify one issue for you. Mr. Hanson has a right at every stage of this proceeding under the Illinois and United States constitutions to remain silent.
>
> As part of that right, I need you to be aware that I–the Court could not order him to agree to any interview or testing by an expert on behalf of the State. The State did not make

---

[2] At the time *Lee* was decided, this court's Rule 413, governing discovery, did not apply to death penalty proceedings. Although Rule 413 was soon after amended to include such cases, the rule still does not require a defendant to submit to a psychiatric examination.

such a request in this case, but you need to be aware that I could not have ordered him to do so, and he would have had no obligation to agree to an interview or test by an expert on behalf of the State. That's his right. We've talked about it many times.

An expert could have reviewed reports and records in this case. The State chose not to do that and they may be discussing that in their argument or not as they see fit.

In any event, I want you to be aware that that's the case. So there is no misunderstanding, again, I'm not at all saying that either side did anything wrong in this case, and certainly Mr. Hanson was never asked to submit, but under the law he has no right to submit, nor could I order him to submit to any interview or testing by an expert on behalf of the State. Thank you."

Defendant did not object to this instruction. During the sidebar preceding the instruction, the circuit court asked if defendant had any objection to informing the jury that defendant could not be required to testify. Defense counsel responded, "[o]nly with the caveat, your Honor, as long as the jury understands that they [the State] were allowed–were given the documents, the same documents that Dr. Dawkins had *** and that their expert could have given an opinion based on the records aside from any interview with Mr. Hanson." Defendant's "caveat" was satisfied when the court instructed the jury that the State could have hired an expert to review the documents. Therefore, we conclude that defendant has forfeited this issue.

Anticipating the State's forfeiture argument, defendant acknowledges that "the error was not as well preserved as it might have been had counsel made the most appropriate objections." Thus, defendant first argues that application of the waiver rule is less rigid where the basis of the objection is the trial judge's conduct, a doctrine referred to as the *Sprinkle* doctrine. See *People v. Nevitt*, 135 Ill. 2d 423, 455 (1990). Defendant's reliance on *Nevitt* is misplaced. As this court recently explained in *People v. McLaurin*, relaxing the waiver rule is warranted when the trial judge has overstepped its authority in the presence of the jury or when counsel is effectively prevented from objecting as any objection would have "fallen on deaf ears." *People v. McLaurin*, 235 Ill. 2d 478, 488 (2009).

In this case, however, the circuit court first informed both parties of its intended instruction during a sidebar outside the presence of the jury. Counsel had ample time to argue its point that the State could have had an expert review Dawkins's findings. Indeed, it did argue that point and succeeded in having the court include a statement in its instruction reflecting defendant's position. For this same reason, we cannot say that any objection would have "fallen on deaf ears." The circuit court incorporated defendant's suggestion into its instruction, and defendant otherwise made no objection to the content of the instruction. Therefore, we decline to relax the forfeiture rule in this case based on *Sprinkle*.

Defendant argues, in the alternative, that this court should review the issue for plain error. As discussed above, plain error analysis first requires us to examine whether a clear and obvious error occurred. Defendant argues that the instruction was error in that it penalized defendant for exercising his Fifth Amendment rights by letting the jury believe that defendant had obstructed the State's efforts to rebut defendant's mitigation arguments.

We find no error in the court's instruction. First, the instruction, as delivered, was a correct statement of the law. During the sentencing phase of a capital case, a defendant is not required to submit to examination by the State. In clarifying this to the jury, the circuit court corrected defense counsel's prior statement that suggested that the State could have hired its own expert and that defendant would have had to subject himself to those interviews. The court's statements regarding the State's options were also a correct statement of the law. The State could have hired an expert to review the findings of Dr. Dawkins. 134 Ill. 2d R. 413(c). The State chose not to do so.

Defendant argues that *People v. Szabo*, 94 Ill. 2d 327 (1983), and *People v. Mulero*, 176 Ill. 2d 444 (1997), support his argument that he was penalized for exercising his fifth amendment rights. The defendant in *Szabo* was convicted of murder. During the sentencing phase of his trial the defendant testified in support of mitigation. Specifically, he explained to the jury how bad he felt about what he had done, and expressed remorse that he had agreed to go along with his co-conspirator's plan. *Szabo*, 94 Ill. 2d at 358. On cross-examination, the prosecution confronted the defendant with his failure

to express any remorse to police after he had been arrested. The defendant did not admit to police that it was his co-conspirator's idea to commit the murder. In finding error in the State's cross-examination, this court concluded "[t]here is no question that such remarks are fundamentally unfair and amount to a deprivation of due process in allowing an arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Szabo*, 94 Ill. 2d at 359.

Similarly, the defendant in *Mulero*, convicted of murder, testified at her sentencing hearing in mitigation that she confessed and pleaded guilty because she knew her actions were wrong and was remorseful. *Mulero*, 176 Ill. 2d at 459. On cross-examination, the prosecution raised the issue of a motion to suppress her confession. In that motion, the defendant alleged that she confessed because the police had tricked her and did not mention anything about remorse. *Mulero*, 176 Ill. 2d at 460-61. The State then used that motion to suppress to suggest that the defendant had pleaded guilty to avoid a harsher penalty and not because she felt guilty about what she had done. *Mulero*, 176 Ill. 2d at 461. This court found error with the State's cross-examination. It concluded that "[t]he sentencing jury was in effect told that it could consider defendant's exercising of her constitutional right to remain silent as an aggravating factor against her." *Mulero*, 176 Ill. 2d at 463. This tactic, if allowed, would have a "chilling effect" on a defendant's decision to file a motion to suppress or otherwise exercise her fifth amendment rights. *Mulero*, 176 Ill. 2d at 463.

We find *Szabo* and *Mulero* to be distinguishable. In each of these cases, the defendant's silence was directly used against him or her on cross-examination. The prosecution in each case specifically referred to the defendant's silence to infer the defendant was pretending to be remorseful to avoid a death sentence. However, the State did not ask the jury to make such an inference in this case. It did not ask defendant about any postarrest silence. It did not confront him with a refusal to submit to a psychiatric exam, as the State never requested one. The only statement presented to the jury about defendant's right to remain silent was presented by the court.

Rather, in this case the judge in no way suggested that the defendant interfered with the State's effort to perform a psychological evaluation. The court's instruction made clear that although defendant

was not required to submit to an interview, the State could have requested a voluntary interview. The court noted that State did not submit such a request. Nor did the court imply that defendant obstructed any other efforts. The court was clear that the State could have asked another expert to review the documentation gathered by Dawkins and noted, again, that the State declined to do so. Thus, the instruction clearly noted that the State did not make any effort to hire an expert.

This instruction, taken as a whole, supported most of defense counsel's argument that Dawkins's testimony went unchallenged. With the one exception of the statement suggesting that defendant "would have had to subject himself" to an interview, defense counsel's statements were proper. The instruction allowed the jury to note that although the State could have hired an expert or requested defendant to voluntarily submit to an interview, it did not take the opportunity to do so. Whereas in *Szabo* the jury was expressly told that the State's efforts were hampered by the defendant's exercise of his fifth amendment rights, the jury here was instructed that the State made no such efforts to produce evidence in rebuttal. Therefore, we hold that the circuit court did not err in giving the instruction as to defendant's right to remain silent.

VII. Defendant's Request for Subpoenas to Collect Data

During the sentencing phase of defendant's trial, defendant filed a motion to declare the death penalty unconstitutional, which included a discovery request to subpoena records that would "demonstrate the empirical basis for [defendant's] contention that *** the Illinois Death Penalty Act fails to sufficiently narrow the class of persons eligible for the death penalty." The circuit court denied defendant's request.

A subpoena is a judicial process, and the circuit court determines whether the subpoena is unreasonable or oppressive. *People ex rel. Fisher v. Carey*, 77 Ill. 2d 259, 265 (1979). Thus, the decision to issue a subpoena is reviewed for abuse of discretion. *People v. Jones*, 295 Ill. App. 3d 444, 450 (1998).

Defendant contends that this court's opinion in *People v. Ballard*, 206 Ill. 2d 151 (2002), indicated a need for empirical analysis of whether eligibility for the death penalty is properly narrowed by

aggravating factors. Defendant argues that his subpoena request was an attempt to avoid the criticism that the defendant in *Ballard* faced, which was an inability to show his claims were empirically correct.

We cannot accept defendant's interpretation of *Ballard* as providing the basis for requiring the circuit court to allow subpoenas to conduct a statewide review of death penalty cases. Defendant in this case requested discovery of "all information on these issues from records or files from the various prosecutor's offices and public defenders' offices in Illinois." The information sought by defendant would include records not only of death penalty cases but of non-death-penalty murder cases as well. Issuing a subpoena requiring such discovery would be unreasonable and oppressive. Broad discovery of this type becomes even less reasonable and more burdensome when, under defendant's interpretation of *Ballard*, one may presume *every* defendant would be entitled to the same remedy. Thus, the time and effort spent in complying with subpoenas would be multiplied as each defendant conducted his own analysis, which may ultimately differ from the analyses of other defendants. This is not a proper use of the court's subpoena power.

In addition to creating a burdensome scenario that could possibly lead to incomplete or inconsistent results, defendant's interpretation misreads the court's intent in *Ballard*. This court's decision in *Ballard* was not an invitation for defendants to seek to use the judicial process as a means of compelling the collection of empirical data on the death penalty. Rather, *Ballard* noted that defendant provided no evidence " ' "on this record, or through sources of which we might take judicial notice, that his claims are empirically accurate, or that, if they were correct, this would require the invalidation of the death penalty law." ' *** [Citation.]" *Ballard*, 206 Ill. 2d at 200. Setting aside for a moment the second half of that statement, that there is no certainty that any empirical evidence would even require invalidating the death penalty, *Ballard* required only that if a defendant were to make an empirical claim, he need provide some support. *Ballard* did not suggest, however, that it would be appropriate for a defendant to request that the court compel production of possibly thousands of documents from offices throughout the state. Under *Ballard*, defendants may present empirical evidence, but are not entitled to require the circuit court to issue unreasonable discovery orders.

Therefore, we conclude that the circuit court did not abuse its discretion in denying defendant's subpoena request.

## VIII. Eighth Amendment Challenge

Defendant next argues that the Illinois death penalty statute is unconstitutionally excessive in that it fails to satisfy its legislative purposes of incapacitation, deterrence and retribution. Defendant cites as support the concurring opinion of Justice Stevens in the recent Supreme Court case *Baze v. Rees*, 553 U.S. 35, 170 L. Ed. 2d 420, 128 S. Ct. 1520 (2008).

This court discussed in detail the analysis required by the eighth amendment in capital cases in *People v. Ballard*, 206 Ill. 2d at 194-200. Although *Ballard* did not directly address the concerns raised by defendant in this case, the analysis adopted in *Gregg v. Georgia*, 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976), and its progeny remains the framework for determining whether a state's death penalty statute is unconstitutionally excessive. Whatever the merits of Justice Stevens's arguments regarding incapacitation, deterrence and retribution, the full Court has not incorporated such factors into its jurisprudence as constitutionally significant. We decline to expand the Court's analysis, and we suggest that at this time defendant's arguments would be more appropriately directed to the legislature.

## IX. *Apprendi*

Defendant lastly contends that the Illinois death penalty statute, as amended, violates the principles announced in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), because the statute does not require the State, at the second stage of the death sentencing hearing, to prove beyond a reasonable doubt that aggravating factors outweigh mitigating factors. This court has repeatedly rejected this argument. *People v. Harris*, 225 Ill. 2d 1, 50 (2007); *People v. Thompson*, 222 Ill. 2d 1, 52-54 (2006); *People v. Mertz*, 218 Ill. 2d 1, 93-94 (2005). Defendant has not persuaded us to overturn these decisions.

## CONCLUSION

As to defendant's alleged guilt-phase trial errors, we conclude: (1) the circuit court did not misapply the forfeiture by wrongdoing doctrine and that it properly admitted the testimony of Jennifer Williams; (2) the circuit court did not err in admitting the testimony of Detective Nilles referencing Jennifer Williams's initial opinion that defendant was involved in the murders; (3) the trial court did not err in its treatment of the airline's computer records indicating that defendant was dangerous; and (4) defendant's convictions for aggravated kidnapping must be vacated.

Although we conclude that defendant's aggravated kidnapping convictions must be vacated, we conclude that the erroneous convictions did not improperly affect the sentencing phase of defendant's trial. We further conclude that no error occurred during the sentencing phase with regard to the testimony of former Warden Cowan or the instruction given to the jury regarding defendant's fifth amendment rights.

Lastly, we conclude that the circuit court did not abuse its discretion in denying defendant's subpoena requests and reaffirm that the Illinois death penalty statute conforms to the Supreme Court's eighth amendment analysis and does not run afoul of *Apprendi v. New Jersey*. Defendant has raised no issue that requires a new trial as to either guilt or sentencing. Consequently, we vacate defendant's aggravated kidnapping convictions but affirm the circuit court judgment in all other respects.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed in part and vacated in part. The clerk of this court is directed to enter an order setting Tuesday, November 9, 2010, as the date on which the sentence of death entered in the circuit court is to be imposed. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 2008). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is now confined.

*Affirmed in part and vacated in part.*