# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Degorski, 2013 IL App (1st) 100580**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES DEGORSKI, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-10-0580 |
| Filed | October 17, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for multiple counts of first degree murder in the robbery of a restaurant was upheld over his contentions that the trial court denied defendant a fair trial by allowing a witness to testify that he was a circuit court judge but had been an assistant State's Attorney when he interviewed defendant and that he thought defendant's confession was reliable, and by playing a videotape depicting the bodies of the restaurant's employees being removed from a freezer, since the testimony about the reliability of defendant's confession was not a surprise to the jury, and the probative value of the video outweighed any prejudicial effect. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 02-CR-15430 (01); the Hon. Vincent M. Gaughan, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and Charles W. Hoffman, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Assistant State's Attorney, of counsel), for the People.

Panel

JUSTICE EPSTEIN delivered the judgment of the court, with opinion.

Justices Fitzgerald Smith and Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1      Juan Luna and James Degorski were charged with multiple counts of first degree murder for the 1993 shooting deaths of seven employees of a Brown's Chicken restaurant in Palatine, Illinois. Following a severed jury trial, Degorski was convicted and sentenced to natural life imprisonment. He argues on appeal that he was denied a fair trial where (1) former Assistant State's Attorney Michael McHale testified that he was now a Cook County circuit court judge and that he believed defendant's confession was reliable, and (2) the trial court allowed the State to play a video depicting removal of several of the employees' bodies from a walk-in freezer. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3      On January 8, 1993, seven Brown's Chicken employees–Michael Castro, Lynn Ehlenfeldt, Richard Ehlenfeldt, Guadalupe Maldonado, Thomas Mennes, Marcus Nellsen, and Rico Solis–were shot to death. Defendant was charged with multiple counts of the first degree murder. During his four-week trial, the parties presented dozens of witnesses. A jury found defendant guilty and eligible for the death penalty, but sentenced him to natural life imprisonment. On appeal, defendant raises several evidentiary issues. We summarize those facts necessary to rule on the issues presented.

¶ 4                                  I. State's Evidence

¶ 5      Palatine police officer Ronald Conley testified that he was on duty in the early hours of January 9, 1993, when he saw a car enter the Brown's Chicken parking lot. He learned that the driver was looking for his older brother, who worked at the restaurant but had not come home that night. Within a few hours, Conley responded to a radio call about a missing juvenile, who also worked at Brown's Chicken. After meeting with the juvenile's family, he proceeded to the restaurant, where he gained entry through an open employee door. Conley

saw a bloody mop just inside the doorway and called for backup.

¶ 6        According to Conley, Officer Saxsma arrived, and the two officers entered the restaurant with guns drawn. Inside, Conley saw a foot and hand protruding from a walk-in freezer on the building's east side. Upon opening the freezer door, they discovered five bodies. Officer Haas arrived, and the three officers searched the rest of the restaurant, ultimately discovering two more bodies in the walk-in cooler on the building's west side. All seven appeared to have suffered fatal gunshot wounds. Assistant medical examiners later confirmed this observation.

¶ 7        Sergeant Robert Jacobsen testified that he helped remove the bodies from the cooler and freezer. The only officer to enter the walk-ins, Jacobsen covered his shoes with plastic bags to protect them from blood and to avoid leaving shoe prints. Despite his efforts, the bags and shoes filled with blood, and the bags adhered to the soles of his shoes. At trial, Jacobsen identified shoe prints in the freezer as his own, but forensic comparison of the prints was not possible, as Jacobsen threw his bloody shoes away. He admitted that he never reported or recorded that he had left shoe prints in the freezer. On cross-examination, defendant questioned whether the shoe prints were Jacobsen's. Consequently, on redirect, the State was allowed to play for the jury a video depicting Jacobsen removing several of the bodies while wearing plastic bags on his shoes.

¶ 8        Forensic investigators discovered that the restaurant's trash cans were empty with the exception of the remains of a four-piece chicken meal, a paper cup, and napkins. The cash register appeared to have been closed and reopened to sell a meal at 9:08 p.m. The receipt was consistent with the meal discovered in the trash can, leading investigators to believe that one of the offenders may have purchased the meal. Investigators also collected extensive trace evidence, including fibers, hairs, blood, and more than 200 fingerprints. On one of the discarded napkins, investigators found a latent fingerprint impression, which was later found to match codefendant's prints. None of the latent prints matched defendant's fingerprints.

¶ 9        Investigators also determined that two of the chicken bones recovered contained saliva. One of these bones produced two DNA profiles: a major profile consistent with someone eating the chicken, and a minor profile consistent with someone touching the chicken with their hands. The major profile matched codefendant. Defendant was excluded as a contributor to the profiles.

¶ 10        Eileen Bakalla testified that she had been friends with defendant and codefendant. On January 8, 1993, she received a telephone call from defendant, who asked her to meet him and codefendant in a Jewel grocery store parking lot in Carpentersville, Illinois. Defendant added that they had "done something big." Bakalla left work at 9:30 p.m. and met defendant and codefendant as planned. In the parking lot, she noticed green rubber gloves in the back of codefendant's car. The friends drove to Bakalla's townhouse in her car. En route, she asked the two men about a canvas money bag they had brought with them, and they replied that it contained money from their Brown's Chicken robbery.

¶ 11        At Bakalla's house, defendant and codefendant split the money, and defendant gave Bakalla $50 he owed her. The three smoked marijuana and remained at Bakalla's house for a few hours before Bakalla dropped codefendant back off at his car. She and defendant drove

past Brown's Chicken, where they saw ambulances and squad cars in the parking lot. Defendant told her that codefendant had gone "ballistic and started killing people," "slit the owner's throat from ear to ear," and "put the rest of the employees in the cooler [and] in the freezer." Defendant said codefendant had shot four people in the cooler and handed the gun to defendant, who shot two people in the freezer. He added that they had worn gloves, mopped the floor afterward, and thrown the gun in the Fox River. Bakalla and defendant then went to defendant's home, where they spent the night. The following day, Bakalla accompanied defendant as he cleaned codefendant's car at a Streamwood, Illinois, carwash.

¶ 12        Bakalla did not inform police about the murders until they approached her on May 15, 2002. She testified, however, that she informed her husband, Keith Abel, about the murders prior to their 1998 wedding. Abel testified that, in 1998, Bakalla told her that defendant and codefendant had done "something big" and mentioned Brown's Chicken.

¶ 13        Anne Lockett testified that she had been friends with defendant, codefendant, and Bakalla, and had also dated defendant. She frequently abused drugs and alcohol in 1992 and 1993 and twice attempted suicide. Following one such attempt, she was brought to a hospital, where, on January 9, 1993, she received a telephone call from defendant, who told her to watch the news that night because he had "done something big." The lead story that night concerned the Brown's Chicken murders.

¶ 14        Following her January 25, 1993 release from the hospital, Lockett met defendant and codefendant at defendant's home. Defendant offered to tell her about the Brown's Chicken robbery, noting that they had already told Bakalla because they had to use her as an alibi. Defendant and codefendant than told Lockett that, wearing old clothing and shoes, they had driven codefendant's car to Brown's Chicken. There, they had placed a wedge behind the back door to prevent the employees' escape. Codefendant ordered a chicken dinner, which upset defendant, who was worried that he would leave greasy fingerprints. The two men then went into the bathroom and put on gloves.

¶ 15        When they exited the bathroom, an employee tried to exit through the back door, but the wedge prevented his escape. Defendant and codefendant crowded the employees into the freezer and cooler and shot them. Codefendant slit one woman's throat, and another employee vomited french fries when shot. Defendant and codefendant then mopped the floor and wiped the area down to remove fingerprints. They later threw their clothes into a dumpster and the gun into the Fox River.

¶ 16        They explained to Lockett that they had chosen Brown's Chicken because codefendant had worked there, and they committed the offense because codefendant wanted to see what it was like to kill someone, and defendant agreed to help. They told Lockett that they would kill her if she told anyone. Lockett further testified that defendant had owned a silver .38-caliber revolver that he kept in his bedroom, but she never saw it after her hospital discharge.

¶ 17        On February 17, 1993, police interviewed codefendant because of his previous employment at Brown's Chicken. Per his request, Lockett accompanied him, posing as his girlfriend. She sat in a waiting room for less than a half-hour. No one spoke to her. In March of 2002, Lockett received a telephone call from a Palatine police officer named King. King was the first law enforcement official she told about her knowledge of the Brown's Chicken

murders. Lockett explained that she had not come forward earlier because she was afraid defendant would kill her if she did.

¶ 18    Police Commander William King testified that he spoke with Lockett in March of 2002. After that conversation, he spoke with codefendant at his Carpentersville home on April 3, 2002. Codefendant agreed to a buccal swab, which King later submitted for analysis. King also spoke with defendant at the Palatine police station on April 27, 2002. Defendant denied involvement in the murders and provided fingerprints and a buccal swab.

¶ 19    On May 7, 2002, King learned that the major DNA profile from the four-piece chicken dinner matched codefendant. On May 16, 2002, King and Detective Briscoe met defendant in Indianapolis, Indiana, and drove him to Palatine. Defendant returned voluntarily. They did not discuss the case during the four-hour drive. En route, Palatine's police chief called King and told him that the station was surrounded by reporters and they should proceed to the Streamwood police station instead.

¶ 20    After defendant waived his *Miranda* rights, King told him he believed he was involved in the Brown's Chicken murders. Defendant responded that he was sorry for what happened. He stated that he and codefendant had driven to Brown's Chicken in codefendant's Ford Tempo, and defendant brought his .38-caliber handgun. They chose Brown's Chicken because codefendant had worked there. They entered the restaurant, ordered a meal, and ate it. After the meal, they announced a robbery. A young employee mopping the floor offered the men money, but they told him to put it away and go to the back of the store. Codefendant then shot a woman. They ran out of the restaurant, drove away, and disposed of the gun. Defendant's share of the robbery proceeds was approximately $800.

¶ 21    After a break, King returned to the interview room with Assistant State's Attorney (ASA) Michael McHale. McHale explained that he was a prosecutor and advised defendant of his *Miranda* rights. McHale and defendant spoke for approximately one hour before McHale exited the interview room, complaining that he felt ill and was going to rest.

¶ 22    After defendant used the washroom, he asked to speak to King alone. After King readvised defendant of his *Miranda* rights, they spoke for approximately two hours. Defendant again told King that he and codefendant had planned to rob Brown's Chicken because codefendant used to work there. They went at closing time because they thought fewer employees would be there. Defendant brought a .38-caliber revolver and a knife with a brass-knuckle handle. They drove to the restaurant in codefendant's Ford Tempo, parked in the mall parking lot, and sat in the car while a young lady loaded "two crippled kids" into a van. After she left, they entered the restaurant and were surprised to find seven employees working. They ordered a meal, which codefendant ate before throwing the remnants in the garbage. Defendant then handed a set of green rubber gloves to codefendant, and they announced a robbery.

¶ 23    A young, skinny kid who was mopping the floor offered them money, but defendant told him to put it away and get in the back. Defendant fired a warning shot and told the employees to move to the back of the store. In the west walk-in cooler, defendant found two older men, kneeling, facing the wall. He shot them in the back and then in the head. Defendant reloaded and handed the weapon to codefendant, who was yelling at a female employee. Defendant

mopped the floor, and codefendant turned off the lights. Codefendant then slit the female employee's throat, shot her and the other employees, and placed money in a cloth bag.

¶ 24 The two men left Brown's Chicken and drove to the Carpentersville Dam, where defendant threw his gun, knife, and casings into the Fox River. They met Bakalla in a Jewel parking lot in Carpentersville and proceeded to her house, where defendants split the money, and defendant gave Bakalla $50 he owed her. They dropped codefendant back off at his car, which he had left in the Jewel parking lot, and defendant and Bakalla drove toward Palatine. Along the way, defendant told Bakalla about the robbery. They drove past Brown's Chicken, where they saw several ambulances and squad cars. The following day, defendant and Bakalla took codefendant's car to a car wash.

¶ 25 Defendant further told King that Lockett was the only other person defendant told about the offense. Codefendant was mad that he told "the girls." Defendant added that the restaurant employees were nice. King asked why he would kill them if they were nice. Defendant replied, "because [we] wanted to do something big." Following his interview with King, defendant spoke with ASA McHale for approximately three hours.

¶ 26 Former ASA McHale testified that he was a Cook County circuit court judge, but previously served as an assistant State's Attorney and, in that capacity, had interviewed defendant. His initial interviews with defendant were slow-going, and he learned only that defendant and codefendant had robbed the Brown's Chicken with a silver gun and that a young employee had been mopping the floors. Following the first interview, McHale, who was ill that evening, slept while King interviewed defendant. McHale later returned to the interview room, and defendant described the offense in greater detail.

¶ 27 Defendant told McHale that he and codefendant had driven to Brown's Chicken in codefendant's Ford Tempo with bullets, rubber gloves, a .38-caliber revolver he had purchased from Matt Wzientek, and a knife with a brass-knuckle handle. They entered at around closing time when no other customers were present. Codefendant ordered a chicken dinner, ate some of it, and threw the rest in the trash. The two men then put on rubber gloves, and defendant handed the knife to codefendant. Defendant fired a warning shot and told the employees to go to the back of the restaurant. A young man offered him cash, but defendant told him to go to the back of the store.

¶ 28 Defendant shot two men in the walk-in cooler, reloaded, and handed the gun to codefendant. As defendant mopped the floor to remove footprints, codefendant yelled at a female employee, punched her, cut her with a knife, and then shot her and the other employees. They then exited through a rear door. The men drove to the Fox River, where they discarded the gun and knife. They then drove to the Jewel in Carpentersville, where they met Bakalla. The three drove to Bakalla's house, where they smoked marijuana and split the money. Defendant's share was between $700 and $800. He also gave Bakalla a small amount of money.

¶ 29 Bakalla and defendant dropped codefendant off at his car, which was still in the Jewel parking lot, and drove past Brown's Chicken, where they saw ambulances. Although defendant had already told Bakalla that they had robbed Brown's Chicken, he now informed her that they had also shot the employees. Bakalla dropped defendant off at home, and

-6-

defendant threw his clothes in a dumpster. Defendant also informed McHale that he had told Lockett about the murders shortly after she was released from the hospital. McHale asked defendant if he wished to memorialize his statement, but defendant declined because he was tired and wanted to sleep.

¶ 30 Matt Wzientek testified that he sold a .38-caliber revolver and a box of round-nose bullets to defendant in 1992.

¶ 31 Medical Technician Alicia Hines testified that she spoke with defendant on May 19, 2002, after he had suffered a broken jaw. Hines learned that defendant had been arrested for the Brown's Chicken murders and asked him how he could kill seven people and whether he had been drunk or high at the time. Defendant responded that he had been sober, and the murders were "just for fun." Hines did not document this conversation.

¶ 32 Firearms expert Peter Striupaitis testified that round-nose bullets were recovered from the scene, and they had been fired from a .38-caliber revolver. He never received a gun for forensic analysis.

¶ 33 Debbie Medow testified that, on January 8, 1993, she took two developmentally challenged persons from the residential home where she worked to Brown's Chicken. They remained at the restaurant until it closed at 9:00 p.m. The restaurant had no other customers, and she did not notice any other cars in the parking lot.

¶ 34 Defendant's former coworker, Walter Hanger, testified that, in early May of 2002, defendant asked him, "if you killed somebody, would God forgive you?"

¶ 35                                  II. Defense Evidence

¶ 36 James Bell, former coordinator of the Brown's Chicken Task Force, testified that a man named Jonathan Simonek made several incriminating statements in 1998 and gave a videotaped confession in August of 1999. He testified to the content of Simonek's 1999 confession.

¶ 37 Palatine police officer Keith Kirkpatrick testified that he took Simonek's videotaped confession on August 5, 1999. Simonek claimed in his statement that he and Todd Wakefield committed the murders. Simonek's statement was played for the jury.

¶ 38 Simonek testified at defendant's trial that he confessed to the murders because police were harassing him and his parents. At the station, police told him that he would not be allowed to leave or make a telephone call until he told them what they wanted to hear. He told them things that he had read in the newspapers and made up other details. When he provided an incorrect detail, detectives would say, "that's not what happened," and he would change his story. Simonek testified that he had was not involved in the Brown's Chicken murders.

¶ 39 Casey Haefs, a former cashier at Brown's Chicken, testified that, after being harassed by police, she gave a false statement implicating Simonek and Wakefield. She further stated that Officer Jim Bell pressured her into giving that statement.

¶ 40 Forensic analyst Charles Principe testified that he was responsible for photographing, recovering, and preserving footwear impressions at the scene. He stated that he was unaware

of any bloody impressions in either the freezer or the cooler, but noted that he photographed only impressions that had evidentiary value and would not have photographed prints left by police.

¶ 41    Forensic analyst Mark Acree testified that the mop handle found in Brown's Chicken had a fingerprint suitable for comparison, but it did not match defendant's prints. Acree did not compare the print to those of the seven employees.

¶ 42    Several witnesses testified that a dive team failed to recover a gun in the Fox River.

¶ 43    Jessica Mogilinski, defendant's former neighbor, and Mark Mogilinski, defendant's former employer, testified to defendant's reputation for nonviolence.

¶ 44    The parties stipulated that defendant's DNA profile did not match the profiles recovered from the Brown's Chicken trash can.

¶ 45                                     III. Verdict and Sentence

¶ 46    The jury found defendant guilty of seven counts of first degree murder. Although the jury also found defendant death-eligible, they declined to impose the death penalty, and defendant was sentenced to life imprisonment. Defendant now appeals.

¶ 47                                     ANALYSIS

¶ 48    Defendant argues on appeal that he was denied a fair trial where (1) former Assistant State's Attorney Michael McHale testified that he was now a Cook County circuit court judge and that he believed defendant's confession was reliable, and (2) the State played a video depicting the removal of bodies from a walk-in freezer. We affirm.

¶ 49                                     I. Michael McHale's Testimony

¶ 50    At trial, defendant argued that the only evidence tying him to this offense was his false confessions to Bakalla, Lockett, King, and McHale. He now contends that this theory was unfairly undermined when McHale testified that he is now a judge and that he believed defendant's confession was reliable. We disagree.

¶ 51                                     A. McHale's Judgeship

¶ 52    Defendant moved *in limine* to bar "[u]se of the title 'Judge,' or any other reference to the fact that he is a sitting Cook County Judge when referring to former Assistant State's Attorney Michael McHale." He argued that McHale's occupation improperly bolstered his credibility. The State responded that McHale's judgeship was relevant to his credibility. The trial court denied defendant's motion, but cautioned the State, "I don't want you constantly every other word saying, Judge, Judge, Judge. You can establish it then move on."

¶ 53    At trial, the State asked McHale two questions about his occupation:

          "Q. [State]: Sir, would you please tell us your name and spell your last name for the record?

          A. [McHale] Michael McHale, M-c-H-a-l-e.

Q. Sir, what do you do for a living?

A. I'm a Judge with the Circuit Court of Cook County.

Q. And where are you assigned as a judge?

A. I'm currently assigned to the domestic violence courthouse."

On cross-examination, defendant asked, "So from the time that you became a licensed attorney to the time that you left the office to become a judge, you were always a prosecutor?" McHale answered affirmatively. Later, during closing argument, the State contended, "Assistant State's Attorney, now Judge McHale, gave [defendant] a choice" of how to memorialize his statement. McHale's occupation was not otherwise mentioned during the proceedings.

¶ 54 Defendant maintains on appeal that McHale's judgeship was irrelevant and its prejudicial effect outweighed its probative value. The State contends that McHale's occupation was relevant to his credibility. Alternatively, the State argues that any error was harmless beyond a reasonable doubt.

¶ 55 Initially, the parties disagree about the standard of review. The State argues that we should review the trial court's denial of defendant's motion *in limine* for an abuse of discretion. Defendant agrees that evidentiary rulings in general, and the denial of a motion *in limine* in particular, are normally reviewed for an abuse of discretion. See *People v. Morgan*, 197 Ill. 2d 404, 455 (2001) (evidentiary issues are reviewed for an abuse of discretion); *People v. Illgen*, 145 Ill. 2d 353, 364 (1991) (same); *People v. Hanson*, 238 Ill. 2d 74, 96 (2010) (trial court's ruling on a motion *in limine* should not be reversed absent an abuse of discretion); *People v. Kirchner*, 194 Ill. 2d 502, 539 (2000) (same); *People v. Williams*, 188 Ill. 2d 365, 369 (1999) (same). Relying on *People v. Williams*, 188 Ill. 2d at 368-69, however, defendant notes that "where the trial court decides an evidentiary issue by erroneously applying the applicable law, a legal question is presented and review is *de novo*." He argues that, in this case, "the trial court did not abuse its discretion in allowing the admission of [McHale's] testimony, but rather, the court erred in allowing that testimony because it had no discretion to do so."

¶ 56 In *Williams*, the trial judge ignored a "quite-settled rule" in Illinois regarding the consequences of a guilty plea and applied New York law instead. *Id.* at 373-74. Our supreme court found that the trial court had not "exercise[d] its discretion within the bounds of the law," and therefore *de novo* review was appropriate. *Id.* at 369. The Illinois Supreme Court later clarified that the *Williams* court held only that "reviewing courts should defer to trial court's evidentiary rulings even if they involve legal issues unless [the] 'trial court's exercise of discretion has been frustrated by an erroneous rule of law.' " *People v. Taylor*, 2011 IL 110067, ¶ 27 (quoting *Williams*, 188 Ill. 2d at 369); see also *People v. Voit*, 355 Ill. App. 3d 1015, 1023 (2004) (so long as the trial court exercises its discretion within the bounds of the law, a reviewing court will not disturb the court's ruling on motions *in limine* absent an abuse of discretion).

¶ 57 Unlike in *Williams*, where the trial court applied the law of another jurisdiction instead of well-established Illinois law, here, the law regarding whether a judge may testify to his or her occupation where he or she is called to testify regarding a nonjudicial matter is not well

-9-

established. Defendant cites no authority that supports his allegation that the evidentiary matter here was outside of the court's discretion or that the trial court acted outside of the bounds of the law. We therefore apply the abuse-of-discretion standard. See *People v. Hansen*, 327 Ill. App. 3d 1012, 1016-17 (2002) (refusing to apply *de novo* review to a ruling on a motion *in limine* where *Williams* was inapplicable).

¶ 58 Turning to the merits, we must decide whether the trial court abused its discretion in allowing McHale to testify that he is a judge. *People v. Jordan*, 205 Ill. App. 3d 116 (1990), is nearly identical to the instant case. There, Assistant State's Attorney Brian Telander interrogated the defendant and obtained a confession. *Id.* at 119-20. Prior to trial, he left the Du Page County State's Attorney's office to serve as an associate judge of the circuit court. *Id.* at 117-19. The defendant moved *in limine* to bar evidence that Telander was now a judge. *Id.* at 117-18. The trial court denied the defendant's motion, but cautioned the State not to "refer to him as Judge Telander in any manner or fashion." *Id.* at 118. At trial, the State referred to him as "Judge Telander" nine times during direct examination and four times in closing argument. *Id.* at 121-22.

¶ 59 The defendant argued on appeal that the trial court erred in denying his motion *in limine*, because the State merely wanted to "qualify Telander as a sort of expert on credibility, coloring the jurors' perception both of what Telander himself had to say and what [the defendants] supposedly admitted to him" and that "the 'prestige and prominence' of his position as an associate judge *** artificially enhanced his credibility in the eyes of the jury." *Id.* at 120-22. The appellate court rejected the defendant's argument and held that the trial court had not abused its discretion because the jury was "entitled to know that Brian Telander was now employed as an associate judge in Du Page County *** [where a] witness' occupation and related background is of value to the jury in determining the credibility of the witness and his testimony." *Id.* at 121. The court further held that neither the State's repeated reference to "Judge Telander" nor its alleged insinuation that Telander was a more believable witness due to his position improperly bolstered his credibility. *Id.* at 122-23. See also *Ginsberg v. McIntire*, 704 A.2d 1246, 1259 (Md. 1998) (citing *Jordan* and holding that, "[i]nasmuch as [the party] had a right to call her former attorney as a fact witness, the jury was entitled to hear that the witness was, at the time of testifying, a circuit court judge ***. It is simply a part of the customary, preliminary background examination of any fact witness.").

¶ 60 The instant case is not meaningfully distinguishable from *Jordan*. McHale, like the assistant State's Attorney there, interrogated defendant and obtained a confession. Prior to trial, he left the State's Attorney's office to serve as a circuit court judge. Defendant, like the defendant in that case, moved *in limine* to bar evidence that McHale was now a judge. The trial court denied defendant's motion, but cautioned the State, "I don't want you constantly every other word saying, Judge, Judge, Judge. You can establish it then move on."

¶ 61 We agree with the *Jordan* court. The trial court here did not abuse its discretion in denying defendant's motion *in limine*. Occupation is an ordinary part of the background information elicited from any witness. While a judge's occupation may lend an air of credibility to his or her testimony, the jury is still free to disbelieve the witness. There was less of a danger of unfairness in this case than in *Jordan*. Here, defendant concedes that the

State complied with the court's ruling, referring to McHale as "judge" only three times–twice during direct examination, once in closing. The State in *Jordan* referred to Telander as "judge" no less than 11 times. *Jordan*, 205 Ill. App. 3d at 121-22. McHale was a critical witness. The State's failure to ask about his occupation would only leave a conspicuous gap in his testimony. We therefore conclude that the trial court did not abuse its discretion, as its ruling was not "fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." *People v. Ortega*, 209 Ill. 354, 359 (2004) (citing *People v. Illgen*, 145 Ill. 2d 353, 364 (1991)).

¶ 62        Defendant does not contest that *Jordan* is strikingly similar to the instant case. He argues, rather, that *Jordan* was wrongly decided. Specifically, according to defendant, the *Jordan* court relied solely on *People v. Crane*, 302 Ill. 217 (1922), and section 607.6 of Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence (4th ed. 1984), which did not support the court's conclusion. Defendant correctly observes that *Crane* concerned a witness's *disreputable* occupation. *Crane*, 302 Ill. at 224-25. But defendant cites no authority, and we have found none, that draws a line for purposes of admissibility between reputable and disreputable occupations. Although this line of cases may have stemmed from impeachment of a witness using his or her disreputable occupation, none of the cases cited by defendant has limited it to that purpose. Indeed, in some of the cases defendant cites, the court stated the general proposition that witnesses may be examined about their occupations. See, *e.g.*, *People v. White*, 251 Ill. 67, 73-74 (1911) ("It is *** proper to cross-examine a witness as to his occupation and other matters which enable to [*sic*] jury to determine what weight ought to be given to his testimony."); *People v. Bond*, 281 Ill. 490, 499 (1917) ("It is permissible to inquire of a witness as to his or her occupation.").

¶ 63        Illinois courts have admitted testimony regarding several other reputable occupations. See *People v. Gray*, 406 Ill. App. 3d 466, 475-76 (2010) (testimony regarding occupation as soldier admissible); *People v. Hawkins*, 243 Ill. App. 3d 210, 220-21 (1993) (testimony regarding occupation as a lawyer admissible); *People v. Christiansen*, 142 Ill. App. 3d 1050, 1058 (1986) (testimony regarding occupation as a lawyer admissible); *People v. Suriwka*, 2 Ill. App. 3d 384, 390-91 (1971) (testimony regarding occupations as priests admissible). Nor does Cleary and Graham's treatise limit disclosure of a witness's occupation to disreputable occupations. See Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 607.6 (10th ed. 2010) ("The occupation and related background of the witness are regarded as having value in determining the credit to be given her testimony and may be inquired into as a matter of right [citation], even though an illegal occupation is disclosed ***."). We therefore disagree with defendant's claim that *Jordan* improperly relied on disreputable occupation cases.

¶ 64        Nor does *People v. Grisset*, 288 Ill. App. 3d 620 (1997), which defendant cites, require a different result. The *Grisset* court held that the trial court in that case did not abuse its discretion in sustaining the prosecution's objection when defense counsel asked the defendant, "Are you employed now?" on direct examination. *Id.* at 631-32. The court held that defendant's occupation in that case was irrelevant and, even if it were relevant, defendant failed to demonstrate that he had suffered prejudice as a result. *Id.* at 632. The *Grisset* court did not hold that a defendant's or a witness's occupation is never relevant, or

-11-

that the trial court in that case would have abused its discretion had it overruled the prosecution's objection. *Id.* at 631-32. Therefore, *Grisset* is unavailing.

¶ 65 Nor do we believe that the prejudicial effect of McHale's judgeship outweighed its probative value. Although circuit court judges hold positions of great authority and influence, see *People v. Willis*, 349 Ill. App. 3d 1, 20 (2004), McHale did not testify regarding his judicial duties or decision-making. He testified regarding his role as a prosecutor interrogating a witness. The State never argued that the jury should give greater weight to McHale's testimony because of his occupation. We cannot say that mentioning McHale's occupation three times during a four-week trial greatly prejudiced defendant.

¶ 66 Even if the trial court had abused its discretion in denying defendant's motion *in limine*, we would find that any error was harmless. The State did not argue that McHale was more credible because he was a judge. See *People v. Williams*, 289 Ill. App. 3d 24, 35-36 (1997) (prosecution may not argue that a witness is more credible because he is a police officer). Nor did the prosecution repeatedly refer to McHale as "Judge," "Your Honor," or any other term that would indicate his position. Thus, even if the trial court had erred, defendant would not have suffered prejudice as a result.

¶ 67 Defendant also confessed to this crime multiple times. He explained their robbery and murder of the employees to Bakalla in great detail, including how many employees they shot, codefendant's act of slitting the owner's throat "from ear to ear," forcing the employees into the freezer, sharing a gun with codefendant, and throwing the gun in the Fox River. Bakalla even saw defendant and codefendant split the money and accompanied defendant the following day when he washed codefendant's car. Defendant's explanation of the offense to Lockett contained even greater detail, noting that they wedged the back door shut, codefendant upset defendant by eating part of a greasy chicken dinner, they entered the bathroom to put on gloves, an employee's escape was foiled by the wedge at the back door, codefendant slit a woman's throat, they crowded the employees into the cooler and freezer, they shot the employees, one employee vomited french fries upon being shot, they mopped the floor and wiped the area for fingerprints, and threw the gun into the Fox River. These are not generic descriptions that defendant could have garnered from the news, but a thorough account of the offense.

¶ 68 Defendant's confessions to Lockett and Bakalla were bolstered by testimony that he owned a .38-caliber revolver, Hines' testimony that defendant told her the murders were "just for fun," as well as the question he posed to Hanger: "if you killed somebody, would God forgive you?" Even though no physical evidence connected defendant to this offense, both DNA and fingerprint evidence inculpated codefendant, defendant's best friend, with whom he was seen almost immediately after the offense. Viewing this evidence in addition to defendant's multiple, detailed confessions over the course of nearly decade, we believe that any error in mentioning the word "Judge" was harmless beyond a reasonable doubt.

¶ 69 B. Testimony Regarding Degorski's Confession

¶ 70 Defendant next claims that McHale improperly testified that he had found defendant's confession to be reliable. At trial, defense counsel cross-examined McHale about obtaining

-12-

a reliable confession, attempting to draw a sharp distinction between ideal interrogation practices and defendant's interrogation. He eventually focused on whether defendant had been shown any crime scene photographs or diagrams that could have led to a false confession. To one of the questions, McHale responded, "his statement to me was reliable." Defendant did not object to McHale's testimony, but later moved for a mistrial, arguing that McHale had improperly volunteered his personal opinion that defendant's confession was reliable and truthful. The State contended that McHale was merely responding to defense counsel's questions. The trial court denied defendant's motion.

¶ 71    As he did at trial, defendant now argues that McHale improperly volunteered his personal opinion that defendant's confession was reliable and truthful. According to defendant, McHale's opinion was unsolicited, unresponsive, and highly prejudicial. The State again contends that McHale's answers were responsive to defense counsel's questions and adds that McHale's testimony was not his present opinion of defendant's guilt, but rather a statement of his opinion at the time of the interrogation.

¶ 72    The parties agree that the admission of this evidence should be reviewed for an abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010) (the admission of evidence is within the trial court's sound discretion, and a reviewing court will not reverse absent an abuse of discretion). Specifically, whether to declare a mistrial falls within a trial judge's discretion. *People v. Redd*, 135 Ill. 2d 252, 323 (1990). A trial court abuses its discretion where its decision was "fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." *Ortega*, 209 Ill. at 359 (2004) (citing *People v. Illgen*, 145 Ill. 2d 353, 364 (1991)).

¶ 73    At the outset, we note that McHale's disputed testimony arose during defendant's cross-examination, not during the State's direct examination:

"Q. [Defense] I'm asking you if that night or that day you asked Jim Degorski whether he had been shown photos?

A. [McHale] I have already told you, no, other than the photo [of Juan Luna] that I showed him.

Q. And you didn't ask him if he had seen photographs or diagrams of the scene?

THE COURT: That's been asked and answered. Move on. ***

Q. And those things would be important, wouldn't they?

A. I don't know what you mean, they would be important. What do you mean by that?

Q. Well, when you talk about getting a statement that's reliable and truthful, you want a statement that is not contaminated by someone having information from outside; right?

A. I suppose that's true, *but his statement to me was reliable*." (Emphasis added.)

We agree with defendant that McHale's answer was unresponsive. Defendant asked a general question: whether McHale sought statements uncontaminated by outside information. This was not an attempt to elicit McHale's opinion regarding the reliability of defendant's statement. McHale's answer–"his statement to me was reliable"–was therefore not a direct

-13-

response to defendant's question.

¶ 74    Defendant did not object, however, that McHale's testimony was unresponsive or improper opinion testimony. Instead, he chose to continue to question McHale about his opinion:

"Q. That's your judgment?

A. You got it. It sure is.

Q. Based on your time that you spent with Mr. Degorski?

A. Based on a three hour, face-to-face conversation where he detailed how he murdered seven people, yes, and *I believed him, Counsel*.

Q. So you want Mr. Degorski to be convicted?

A. I don't–I want this jury to decide what the right thing to do is. I'm just telling you what happened despite a lot of the insinuations that you're making. I'm telling you what I did that night truthfully, and this is for a jury to decide.

Q. Mr. McHale, you just felt the need to give us your opinion about whether Mr. Degorski's statement to you [objection overruled] *** was believable or not?

A. *You asked me the question if it would be reliable, and I told you why I believed it was reliable*, yes." (Emphases added.)

McHale's follow-up answers–"I believed him, Counsel" and "I told you why I believed [defendant's confession] was reliable"–were direct responses to defendant's questions. As to these follow-up questions, we do not believe that defendant should reap the benefit of an error he created.

¶ 75    In *People v. Tolbert*, 323 Ill. App. 3d 793 (2001), the defendant complained on appeal that the trial court allowed lay opinion testimony that he was guilty of murder. The appellate court noted that defense counsel, not the State, elicited that opinion. *Id.* at 805. The court held that defendant was barred from complaining about that testimony, because he "opened the door to the line of inquiry." *Id.* at 806; see also *People v. Payne*, 98 Ill. 2d 45, 50 (1983) (defendant cannot complain of improper evidence he invited). Similarly, here, defendant could have objected to McHale's first answer as unresponsive and improper opinion testimony or, at the very least, refocused his cross-examination on another subject. Instead, he continued to question McHale about his opinion of defendant's confession. Defendant cannot now complain of error he invited. We therefore turn our attention to McHale's only unsolicited, unresponsive comment: "his statement to me was reliable."

¶ 76    The State relies primarily on *People v. Hanson*, 238 Ill. 2d 74, 88 (2010). There, an investigating detective testified that, after speaking with the defendant's sister, he confronted the defendant, stating, " '[your sister] thinks you did this.' " The defendant's sister confirmed this statement during her testimony. *Id.* at 101. Defendant argued on appeal that this constituted improper opinion evidence. *Id.* at 99. Our supreme court noted that neither the detective nor the defendant's sister testified that he or she believed defendant was guilty. *Id.* at 101. Rather, the testimony indicated that, *at the time the statement was made*, the sister believed defendant had caused the deaths in that case. *Id.* The defendant's sister's present opinion of his guilt or innocence was never elicited. *Id.*

¶ 77    This court recently relied on *Hanson* in deciding *People v. Chaban*, 2013 IL App (1st) 112588. There, the State elicited the defendant's wife's testimony that, at the time of the offense, she believed her husband had committed the act, but no longer harbored that belief. *Id.* ¶ 35. The defendant argued on appeal that this constituted improper opinion testimony. *Id.* ¶ 43. The *Chaban* court disagreed and applied *Hanson*, finding that his wife's statements were not opinion testimony, but rather a statement about her belief at the time of the offense. *Id.* ¶ 48.

¶ 78    This cases resembles *Hanson* and *Chaban*. McHale expressed an opinion regarding defendant's guilt, but like the witnesses in *Hanson* and *Chaban*, it was not his present opinion. Rather, he testified in the past tense in both his solicited and unsolicited testimony: "his statement to me *was* reliable"; "I *believed* him, Counsel"; and "I told you why I *believed* it was reliable." (Emphases added.) McHale was referring to his belief at the time of the interrogation, not his belief at the time of trial. But there is a difference between the instant case, on the one hand, and *Hanson* and *Chaban*, on the other. In those cases, the opinions expressed were those of the defendants' family members–in *Hanson*, his sister; in *Chaban*, his wife. *Hanson*, 238 Ill. 2d at 88; *Chaban*, 2013 IL App (1st) 112588, ¶ 35. Here, McHale was defendant's interrogator and an authority figure. See *People v. Crump*, 319 Ill. App. 3d 538, 542 (2001) ("A police officer is a figure of authority whose testimony may be prejudicial if the officer informs the jurors that they should believe a portion of the prosecution's case."); see also *People v. Munoz*, 398 Ill. App. 3d 455, 489 (2010) (witness was "a police officer, and therefore a 'figure of authority,' whose testimony the jury likely would have credited with more weight"). Much like police officers, assistant State's Attorneys are authority figures whose testimony may be prejudicial if they inform the jurors that they should believe the prosecution's case. In this case, however, McHale did not tell the jury what to believe: "I want this jury to decide what the right thing to do is. I'm just telling you what happened despite a lot of the insinuations that you're making. I'm telling you what I did that night truthfully, and this is for a jury to decide." Thus, while McHale briefly expressed his personal opinion regarding the truth of defendant's statement, he did not inform the jury that it should believe the prosecution's case.

¶ 79    Although neither *Hanson* nor *Chaban* involved testimony by police or assistant State's Attorneys, *People v. Moore*, 2012 IL App (1st) 100857, did. In that case, the State played a video of the defendant's interrogation, which the defendant claimed contained police opinions of his credibility and guilt. *Id.* ¶ 52. The *Moore* court held that, "[w]here the testimony is not a current comment on the defendant's credibility *** the police accusations may be seen as a standard interrogation tactic, rather than an improper opinion on [the defendant's] credibility." *Id.*

¶ 80    We find *Moore* instructive. The *Moore* court extended the *Hanson* court's logic to authority figures interrogating a defendant. McHale, like the witnesses in *Hanson*, *Chaban*, and *Moore*, testified not to his present opinion of the guilt, but to his belief at the time of defendant's interrogation that defendant's confession was reliable. We find no reason to part from the *Moore* decision.

¶ 81    Defendant seeks to distinguish *Hanson* and *Chaban* on additional grounds, but in doing so strays from those courts' improper-opinion-testimony analyses and into their relevance

and hearsay analyses. Because this case does not present a hearsay problem and because defendant did not raise relevance as an issue in his briefs, we will not address these issues. See *Hanson*, 238 Ill. 2d at 101 ("while defendant may arguably challenge the testimony as to relevance and hearsay concerns, we reject defendant's argument that this testimony constituted improper opinion testimony"); *Chaban*, 2013 IL App (1st) 112588, ¶ 48 ("[T]his statement is not opinion testimony ***. *** Therefore, the evidence is admissible if its relevance, or probative value, outweighs its prejudicial effect ***.").

¶ 82   Still, defendant urges that McHale's comment was improper opinion testimony. Defendant relies on three cases: *People v. Henderson*, *People v. Crump*, and *People v. Munoz*. *Henderson* is readily distinguishable. The interrogating detective in *Henderson* extensively commented on a video of the defendant's interrogation as it was played for the jury, noting the defendant's body language, vague responses, and profuse sweating. *People v. Henderson*, 394 Ill. App. 3d 747, 750-51 (2009). The appellate court held that this testimony was improper opinion testimony, stating, "An investigator's testimony should be presented only to communicate what was said during an interrogation." *Id.* at 753. The detective's State-led play-by-play analysis of the defendant's "indicators of deception" amounted to the detective's present opinion of the defendant's confession. In contrast, the testimony here–"his statement to me was reliable"–was brief, not a present opinion, and not elicited by the State.

¶ 83   In *People v. Munoz*, 398 Ill. App. 3d 455, 465-66 (2010), the interrogating detective repeatedly testified that he told the defendant that he did not believe him and "he did not believe that 'the defendant ever told [him] the truth.' " The appellate court held that the last statement invaded the province of the jury and was an impermissible comment on the ultimate issue of the defendant's credibility. *Id.* at 488. In *People v. Crump*, 319 Ill. App. 3d 538 (2001), the prosecution asked an investigating officer, " 'Through the course of your investigation, Officer, did you have reason to believe that the defendant in this case committed this offense?' " *Id.* at 540. The officer replied, " 'Yes, I did.' " *Id.* The appellate court held that this constituted improper lay opinion testimony, noting that a police officer is an authority figure, "whose testimony may be prejudicial if the officer informs the jurors that they should believe a portion of the prosecution's case." *Id.* at 542, 544. The court added that opinion testimony by a lay witness is "especially improper and prejudicial when it goes to the ultimate question of fact that is to be decided by the jury." *Id.* at 542 (citing *People v. McClellan*, 216 Ill. App. 3d 1007 (1991)).

¶ 84   The State distinguishes *Munoz* and *Crump* on a single ground: those cases failed to recognize the distinction the *Hanson* court drew between present and past opinions. See *Hanson*, 238 Ill. 2d at 101 (neither detective nor defendant's sister testified to their present opinion of defendant's guilt, but to defendant's sister's impression soon after the offense). On the contrary, we believe the *Munoz* decision, issued less than six months before *Hanson*, anticipated the distinction drawn by the *Hanson* court. The detective in *Munoz* repeatedly testified that he told the defendant that he did not believe him. *Munoz*, 398 Ill. App. 3d at 465, 486-87. The *Munoz* court found that these statements could be excused on the basis that they were part of a sequential account of the detective's interview process. *Id.* at 488. To borrow the *Hanson* court's language, they showed his opinion "at the time the statement was

made." *Hanson*, 238 Ill. 2d at 101. But the detective also stated that, at the time of trial, "he simply did not believe that the defendant ever told *** the truth." *Munoz*, 398 Ill. App. 3d at 488. This court held that this testimony was not a "sequential account of the interview process" but, rather, invaded the province of the jury by telling it whom to believe. *Id.* To borrow once again from *Hanson*, it was improper present opinion testimony. *Hanson*, 238 Ill. 2d at 101. Thus, although it uses slightly different language, *Munoz* drew nearly the same line as the *Hanson* court: present opinion testimony is improper; previous opinion testimony is permissible.

¶ 85    This leaves only *Crump*. The officer there answered affirmatively when the prosecution asked, " 'Through the course of your investigation, Officer, did you have reason to believe that the defendant in this case committed this offense?' " *Crump*, 319 Ill. App. 3d at 540. Like this case, the comment in *Crump* was brief, given by an authority figure, and concerned the officer's past belief, though unlike this case it was elicited by the State. *Id.* at 542-43. We note, as the State does, that *Crump* predates *Hanson*. We also agree with the dissent in *Crump* that the majority there "misconstrue[d] the testimony at issue as 'opinion testimony.' " *Crump*, 319 Ill. App. 3d at 545 (Homer, P.J., dissenting). We are therefore not persuaded that *Crump* should determine the outcome here.

¶ 86    Because McHale's only unsolicited comment was brief, not a present opinion of defendant's guilt, and not elicited by the State in an attempt to prejudice defendant, we hold that the trial court did not abuse its discretion in denying defendant's motion for a mistrial.

¶ 87    Even if we agreed with defendant that McHale's single, unsolicited statement constituted improper opinion testimony, we would find the error harmless beyond a reasonable doubt. The State never mentioned or relied on McHale's brief testimony in its closing argument. Moreover, defendant's conviction did not rest solely on McHale's recitation of defendant's confession. Rather, defendant made similar statements to King, Lockett, and Bakalla, as well as a less extensive admission to Hines. Even though no physical evidence connected defendant to this offense, both DNA and fingerprint evidence inculpated codefendant, defendant's best friend, with whom he was seen almost immediately after the offense.

¶ 88    In light of this evidence, McHale's comment would not have changed the outcome at trial. This is especially true given that McHale's testimony that defendant's confession was reliable was not a great revelation to the jury. The State's case, from opening statement through closing argument, relied on the multiple confessions as its centerpiece. It was clear that the position of the State's Attorney's office was that the confessions were reliable and truthful. The State urged the jury to find McHale's testimony and, in turn, defendant's confession reliable. McHale's single sentence simply made explicit what the State repeatedly contended. Former Assistant State's Attorney McHale's past belief in the reliability of defendant's confession was therefore no surprise to the jury. While we do not wish to minimize the potential danger of improper opinion testimony, the testimony in this case was not improper, and the potential danger given the evidence and the State's arguments was slight. Thus, any error would have been harmless beyond a reasonable doubt.

¶ 89                                II. Video Depicting Body Removal

¶ 90        Defendant argues that the trial court erred in admitting a video depicting removal of several Brown's Chicken employees' bodies from the walk-in freezer. To resolve this issue, we must provide some additional facts.

¶ 91        The defense theory at trial was that defendant's statements to Lockett, Bakalla, King, McHale, and Hines were false, and codefendant Juan Luna acted not with defendant, but with another, unknown partner. In pertinent part, defendant argued that several bloody shoe prints left on the east freezer floor must have been left by codefendant's unknown accomplice. Defendant presented Charles Principe, who recovered, photographed, and preserved shoe print impressions at the scene. Principe was never told about bloody shoe prints in the east freezer. He testified that he would have photographed those prints had they been brought to his attention.

¶ 92        The State argued that the shoe prints belonged to Detective Jacobsen, who helped remove the bodies. Jacobsen testified that, on January 9, 1993, he removed all seven bodies from the freezer and cooler. Prior to entering the freezer, he placed plastic grocery bags over his shoes to protect them and to avoid leaving shoe prints. Jacobsen further testified that, despite his efforts, his shoes and the plastic bags became "saturated with blood." According to Jacobsen, his shoes then began leaving prints because "there was so much blood it was actually adhering to the sole of my shoe, and it would actually leave the shoe impression in blood as I was walking because it was formed up inside my shoes." He stated that he was the only officer inside the freezer and identified the shoe prints in the freezer as his. Jacobsen threw out his blood-soaked shoes that night.

¶ 93        Jacobsen conceded on cross-examination that he did not recall telling anyone that he had contaminated the crime scene and did not include this fact in a police report. He later admitted that he never told anyone that the shoe prints were his until the week of trial. He stated that it was inevitable that he would leave shoe prints. He again asserted that the shoe prints in the photographs were his and he was the only officer inside the freezer. He further stated that, while shoe prints may be recovered and compared, that was not done here.

¶ 94        Following cross-examination, the prosecution complained that defendant had "created the impression that the removal of the bodies is not documented, but it is in fact documented by approximately a two-minute video." The prosecution argued that, because defendant opened the door, it should be allowed to publish the video to the jury on redirect examination. Defendant objected that the video was graphic and its prejudicial effect outweighed its probative value. The trial court agreed with the State that "there was an impression on outstanding cross-examination that there was no documentation of this." The State played the video for the jury during Jacobsen's redirect examination. The video was later allowed into the jury room during deliberations.

¶ 95        Defendant contends on appeal that the trial court abused its discretion in admitting the video. Specifically, he argues the video was gruesome and irrelevant, its prejudicial effect outweighed its probative value, and its introduction deprived him of his rights to due process and to a fair and impartial jury trial. The State responds that the trial court properly exercised its discretion, because the video was relevant and rebutted defendant's implication on cross-

examination that Jacobsen's claim that he left bloody footprints was undocumented and untrue. Alternatively, the State argues that any error was harmless.

¶ 96    The parties agree that we should review the trial court's decision for an abuse of discretion. See *People v. Scott*, 148 Ill. 2d 479, 546-47 (1992) (whether a photograph of the deceased should be admitted falls within a trial court's discretion (citing *People v. Lefler*, 38 Ill. 2d 216, 221 (1967))).

¶ 97    Defendant first argues the video was irrelevant. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. *People v. Lewis*, 165 Ill. 2d 305, 329 (1995). Even gruesome or disturbing photographs may be admitted into evidence if they are "relevant to establish any fact [at] issue." *People v. Lucas*, 132 Ill. 2d 399, 439 (1989); *People v. Garlick*, 46 Ill. App. 3d 216, 224 (1977). Specifically, gruesome evidence may be relevant "to corroborate oral testimony or to show the condition of the crime scene." *People v. Richardson*, 401 Ill. App. 3d 45, 52 (2010). Irrelevant exhibits introduced solely to inflame the jury, however, should not be admitted. *People v. Rissley*, 165 Ill. 2d 364, 405 (1995).

¶ 98    Because the video was offered to rebut impressions defendant created during his cross-examination, we look first to the content of that cross-examination. See *People v. Maldonado*, 402 Ill. App. 3d 411, 418 (2010) (to determine relevance, (1) identify the fact that the party seeks to prove; (2) determine if the fact is "of consequence"; and (3) determine if it " 'tends to make the existence' of this fact 'more or less probable than it would be without the evidence' "). At trial, the State broadly defined the issue, arguing that defendant had "created the impression that the removal of the bodies is not documented." On appeal, defendant narrowly casts the issue, claiming that, on cross-examination, "the defense sought only to establish that [Detective Jacobsen] failed to document the fact that he left the bloody shoe print impressions in the freezer." Neither claim is wholly accurate. On cross-examination, defendant did not claim that the entire body-removal process was undocumented, nor did he simply allege that Jacobsen failed to document his contamination of the scene. Rather, as the State argues on appeal, the claim to be rebutted was that the shoe prints in the freezer were not Jacobsen's:

> "Q. [Defendant] You're telling the ladies and gentlemen of the jury that as you're involved in the body removal process you're paying enough attention to your feet that you know that those specific shoe prints in that freezer are from your shoes?
>
> A. [Jacobsen] They are from my shoes.
> ***
> Q. The truth is those prints in that freezer are not your prints?
> A. They are my shoes."

The issue, therefore, is whether the video was relevant to rebut defendant's claim that the shoe prints were not Jacobsen's. We hold that it was.

¶ 99    The video shows Jacobsen removing bodies from the blood-soaked floor of a freezer while wearing plastic bags on his shoes. While this is not definitive proof that the shoe prints were Jacobsen's, it has a tendency to make the existence of this fact more probable than it

would be without the video. The video was therefore relevant to rebut defendant's claim on cross-examination that the shoe prints were not Jacobsen's. Accordingly, we reject defendant's first contention.

¶ 100    Defendant next contends that, even if the video was relevant, its prejudicial effect outweighed its probative value. See *Maldonado*, 402 Ill. App. 3d at 418 (courts may exclude relevant evidence if its prejudicial effect substantially outweighs its probative value). Courts must weigh an exhibit's prejudicial effect and probative value. *Lucas*, 132 Ill. 2d at 439. If evidence has sufficient probative value, it may be admitted despite its gruesome or inflammatory nature. *Lefler*, 38 Ill. 2d at 221; *People v. Driskel*, 224 Ill. App. 3d 304, 314 (1991). Competent evidence should not be excluded merely because it may arouse feelings of horror or indignation. *Driskel*, 224 Ill. App. 3d at 315.

¶ 101    We agree that the video may have been difficult for some jurors to watch. The 2-minute and 33-second segment is actually several clips edited together, each depicting police officers removing a different body from the freezer and placing it in a body bag. In the foreground, three police officers–one inside the freezer, two outside–lift decedents into the bags. Decedents' arms are extended, either frozen or stiffened by rigor mortis. In some instances, blood and bullet wounds are visible.

¶ 102    We do not agree, however, that the video had little probative value. The video corroborated Detective Jacobsen's testimony that the shoe prints in the freezer were his. The video also undermined defendant's theory that the shoe prints belonged to codefendant's unknown accomplice. The video shows Jacobsen walking in and out of the freezer, helping to pass the bodies to his fellow officers. As he testified, the floor was covered in blood, and he was wearing plastic bags on his shoes. Although it is difficult to determine from the video whether he was leaving shoe prints, or if other shoe prints existed prior to his entry, the video has considerable probative value as to both parties' theories at trial. Nor was the video cumulative of any other evidence presented at trial. Accordingly, we hold that the trial court did not abuse its discretion in admitting the video, because the video's prejudicial effect did not substantially outweigh its probative value.

¶ 103    Even if the video had been erroneously admitted, that error would be harmless beyond a reasonable doubt. As we explained above, defendant's conviction rested on his statements to McHale, King, Lockett, and Bakalla, as well as a less extensive admission to Hines. Even though no physical evidence connected defendant to this offense, both DNA and fingerprint evidence inculpated codefendant, defendant's best friend, with whom he was seen almost immediately after the offense. Had the trial court barred admission of the video, the result would have been the same.

¶ 104                                  CONCLUSION

¶ 105    For the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 106    Affirmed.